MERCY N. BROWN v. THE METROPOLITAN LIFE INSUR-
ANCE COMPANY.

*Life   insurance—Forfeiture—Misrepresentation   in   application—
"Medical attendance" defined—Evidence—" Sound
health" defined.*

1. Where in a suit on a life insurance policy the company claimed
that certain answers of the assured to questions in her applica-
tion were untrue, and the testimony of the plaintiff tended to prove
that the agent who wrote the insurance called at the plaintiff's
house, and asked a few questions of the assured, and filled in the
answers given *after* the assured had signed such application, and
*after* the agent's return to his office,—

   *Held,* that the court erred in instructing the jury that, if they
found this claim to be true, the defendant company could not
defend on the ground of the falsity of such answers ; that it was
a question for the jury whether the assured made the answers
*as written down by the. agent,* and, if she did, their *truth* or
*falsity* should have been inquired into ; and the insertion of such
answers after she had signed the application would not affect the
rights of the beneficiary or the company.

2. An applicant for life insurance was required to name the physician
who last attended her, and the time of such attendance.

   *Held,* that a mere calling into a doctor's office for medicine to
relieve a *temporary* indisposition, not *serious* in its nature, or his
calling on the applicant at home for the *same* purpose, could not
be considered "*an attendance*" within the meaning of this ques-
tion, but that such attendance must have been for some disease
or ailment of *importance,* and not for an indisposition of a day
or so, trivial in its nature, and such as all persons are liable to,
who are yet considered to be in sound health generally.

3. Where an applicant for life insurance stated that her last sickness
was nine or ten years ago, and the disease typhoid fever, and
named the attending physician, and about a year afterwards,

on applying for a second policy in the same company, stated that she had never been sick nor had an attending physician, which last answers were false,—

*Held*, in a suit on the policies, that the court should have instructed the jury that the *second* policy was void, and that the insurance company was not bound to take notice of the answers in the *first* application, nor estopped from showing the falsity of the *later* ones.

4. *"Sound health,"* as used with reference to an application for life insurance, means a state of health free from any disease or ailment that affects the general soundness and healthfulness of the system *seriously*, and not a mere indisposition which does not tend to weaken or undermine the constitution of the assured. The word *"serious"* is not generally used to signify a dangerous condition, but rather to define a grave, important, or weighty trouble.

5. In a suit on a life insurance policy the tenor of the evidence on the part of the defendant was to the effect that the assured was afflicted with Bright's or some other *incurable* disease of the kidneys.

*Held*, that if this were so she had not only a *serious*, but a *dangerous*, disease.

6. In such a case a physician was asked to give a conversation had by him with the mother of the assured (the beneficiary in the policy) as to her daughter's health, he having already testified to a want of knowledge on the subject, not having examined the girl or conversed with her.

*Held*, that the testimony was incompetent as *independent* evidence of the girl's health.

7. On a trial of a suit on a life insurance policy the photograph of the deceased was offered to show her " healthy appearance."

*Held*, that the testimony was incompetent.

8. An applicant for life insurance stated in her application that a physician had treated her some years before for typhoid fever. On the trial of a suit on the policy the physician was sworn as a witness for the company, and asked if such statement was true.

*Held*, that the *fact* as to treatment or non-treatment for the disease named was not a matter of privilege, and that the court erred in rejecting the proposed testimony.   How. Stat. § 7516.

9. Where in a suit on a life insurance policy certain answers of the assured were claimed to be false, and the plaintiff claimed that such answers were filled in after the application was signed and the agent taking same had gone to his office,—

*Held*, that evidence tending to show that such answers were incorrectly written in the application was competent.

10. In such a case the testimony of a physician as to what the
assured said to him regarding her having a certain disease, and
his conclusion from his conversation with her on the subject that
she was not so afflicted, and his statement to that effect in his
written report to the company of such examination, were
admissible as proof tending to show her freedom from such dis-
ease.

Error to Wayne. (Speed J.)    Argued January 19, 1887.
Decided April 14, 1887

Assumpsit.    Defendant brings error.    Reversed.    The
facts are stated in the opinion.

*Edmund Haug*, for appellant:

By the terms of the policies and applications, the repre-
sentations and statements made in the applications were
made warranties, and any deviation from the truth consti-
tuted a breach of the terms of the contract, rendering the
policies void: *Kelsey v. Universal Life Ins. Co.*, 35 Conn.
225; *Jeffries v. Life Ins. Co.*, 22 Wall. 47; *VanBuren v. St.
Joseph Fire Ins. Co.*, 28 Mich. 402, 410; *American Ins. Co.
v. Gilbert*, 27 Id. 429; *Graham v. Fireman's Ins. Co.*, 87
N. Y. 69; *Campbell v. New England Mut. Life Ins. Co.*, 98
Mass. 381, 403, 407; *Miles v. Conn. Mut. Life Ins. Co.*, 3
Gray, 580; *Miller v. Mut. Ben. Life Ins. Co.*, 31 Iowa, 216;
*Brennan v. Security Life Ins. Co.*, 4 Daly, 296.

If the applicant knows, or has any opportunity to know, the
statements made in the application, he is bound thereby:
*American Ins. Co. v. Gilbert*, 27 Mich. 429

Even if the first application was signed in blank, and the
answers afterwards written in by the agent, yet if they were
the answers of the applicant she was bound thereby: Bliss,
Life Ins. § 296; *Geib v. International Ins. Co.*, 1 Dillon, 443;
*American Ins. Co. v. Gilbert*, 27 Mich. 429.

*James A. Randall (John Atkinson*, of counsel), for plaint-
iff:

If defendant's agents prove to be dishonest, the company,
and not their patrons, should suffer: *Tiefenthal v. C. M. F.
Ins. Co.*, 53 Mich. 306.

The conversations of assured with her physicians were
privileged: How. Stat. § 7516; *Briggs v. Briggs*, 20 Mich.
41; and the protection of the statute is never more necessary

than when the patient is dead: *Storrs v. Scougale,* 48 Mich. 387.

MORSE, J.   Plaintiff brought assumpsit in the Wayne circuit court upon two policies of insurance in the defendant company, executed to Mercy Victoria Brown, and payable at her death to plaintiff,—one for the sum of $500, dated March 12, 1883; and one for the same sum, dated May 26, 1884.

Mercy Victoria Brown died on the fourth day of February, 1885.

A written application was made for each insurance.   The defendant claimed that certain statements in said applications, and warranted to be true, were false, and avoided the policies.

In the court below, the plaintiff recovered a judgment for $886.79.

The second policy provided that only two-thirds of the sum insured should be paid.

Upon the first policy it was claimed by the defendant that the answers to the following questions in the application were untrue:

" *Q.* 15.  When last sick?
" *A.* Nine or ten years ago.
" *Q.* 16.  Of what disease?
" *A.* Typhoid fever.
" *Q.* 17.  Name of physician who last attended life proposed, and when?
" *A.* Dr. Henderson, nine or ten years ago. "

It was claimed by the plaintiff that Mr. Wyatt, the agent who solicited the insurance, called at the house with one of the applications (the first one), and asked a few questions. But the answers were not written down there; Mr. Wyatt stating that, because he was afraid his horse would get away, he would write out the answers at the office, and forward them to the company.   The court instructed the jury that, if they found this claim to be true, and believed the testi-

mony of plaintiff, who is the mother of Mercy Victoria Brown, the defendant company was not in a situation to claim that the answers were not true, and that in such case she would be entitled to a verdict for the amount of the first policy; and that if they did not find her testimony in this respect to be true, and found the answers not to be true, then their verdict should be for the defendant as to the first policy; but in considering the seventeenth question, and the answer thereto, they should construe the same as follows: "Name the physician who last attended *for some disease;*" that they should not consider any "merely personal or social call, but an attendance for sickness,—for disease."

The court also instructed the jury as to the second policy, and the application therefor, that as it appeared from the testimony that said company had knowledge, by the first application, of the fact that the answers to the last were erroneous, the defendant could not claim anything from the answers therein being incorrect.

In both applications there was a question, "Is said life now in sound health?" Answer in both, "Yes." It is claimed that these answers were untrue. The court directed the jury that, in order to find the answers to be false, they must find that the assured had some disease of a "serious" nature; that a mere temporary ailment, such as an headache, could not be considered as affecting the truth of such answers.

The counsel for the defendant claims that the testimony showed beyond contradiction that several physicians attended the assured after the time stated in her first application, and that this · undisputed testimony, proving the statement in such application that she was last attended by Dr. Henderson some nine or ten years before 1883 to be false, rendered the first policy issued upon such application void.

The first question to be determined under the first policy is the correctness of the charge of the court that, if Mrs.

Brown's testimony was true, the defendant could not make any defense upon the falsity of the answers in the application, for the reason that they could not be considered the answers of Mercy Victoria Brown.

Mrs Brown, the plaintiff, testified that she was present when Mr. Wyatt, as agent of the company, solicited the insurance of her daughter. He took Victoria's signature to the application, and said he would fill it out down at the office. He was at the house not over five minutes. His horse was standing at the gate, and was restless, and he was afraid it would get loose and run away. Victoria told him that she had trouble every month; that was all the trouble she had; that she was well, except once a month, when she would sometimes have a sick spell of a day or two. He did not ask her about having any kidney disease, or any other ailment or difficulty. Asked her some questions about her father and mother. He told her to sign the application, and he would take it down to the office, and fill it out. He said he could not wait; he was going to dinner, and his horse would not stand.

On cross-examination, she further stated that Wyatt asked Victoria a few questions. He asked her if she was well. She told him she was well, except one thing. He asked her "if she had had any doctor, or something; I don't know." She told him she hadn't any. Does not remember whether he asked her what doctor she had, or whether any one else attended her. Her remembrance of the conversation is quite shadowy and indistinct.

Granted that Wyatt did fill out the application after he returned to the office, and yet we do not think that the evidence of Mrs. Brown warranted the charge of the court in respect to such application. It does not appear from her testimony beyond question that any of the answers claimed to be false were not made by Victoria at the interview at the house. If she did answer at the house as set down in the

application, the fact of such answers being filled in at the office, after she signed the application, can make no material difference in the rights of her beneficiary or the company under said application, and the policy issued thereon.

The question as to whether or not she made the answers to the agent as written in the application should have been submitted to the jury. If they found that she made the answers, then their truth or falsity should have been inquired into. If she did not make them, or any of them, and they were filled in after she signed, without her knowledge or consent, then, as to such answers so inserted, the company would be precluded from defending because of their falsity.

In relation to the answer that Victoria had been last attended by Dr. Henderson some nine or ten years ago, we can find no occasion in the testimony for the instruction of the court that "no merely personal or social call" of a physician could be considered, but it must be an "attendance for sickness,—for disease."

There could be no claim from the record before us that any of the physicians who prescribed for Victoria made any personal or social calls. It appears from Dr. Van Norman's testimony that his services were "professional," and commenced on the sixteenth of October, 1882, and were concluded on the twenty-eighth of May, 1883. There were 14 consultations between those dates. She came to his office each time. He never attended her at the house. Dr. Shurley had professional visits from her at his office between May 20 and June 12, 1881, and attended her once at her home on Lewis street. Dr. Gilbert saw her five times in July and August, 1880, at her home. None of them stated for what ailment they treated her.

As the questions run in the application (15, 16, and 17, as heretofore given), it may be that the assured would naturally answer the seventeenth with reference to a physician attending her for some sickness or disease of more seriousness than

a mere temporary ailment, such as the one indicated by her mother,—trouble with her menses. As these questions and answers ought to be construed liberally in favor of the assured, I am of the opinion that a mere calling into a doctor's office for some medicine to relieve a temporary indisposition, not serious in its nature, could not be considered an attendance by a physician, within the meaning of this question, nor would the calling at the home by the doctor for the same purpose be so regarded. The jury should have been instructed that the attendance of the physician must have been an attendance upon the assured for some disease or ailment of importance, and not for an indisposition of a day or so, trivial in its nature, and such as all persons are liable to who are yet considered to be in sound health generally.

If no reference had been made by the court to the personal or social call, the instruction in this respect would have been as favorable to the defendant as it could claim under the law. We should not reverse the case because of this reference, however, but, as the case must go back for the error already noted, we call attention to the remark as improper because stress is laid upon it by defendant's counsel, and it is claimed by him that it misled the jury.

In regard to second policy of insurance, Mercy Victoria Brown, as appears by the application for the same signed by her April 18, 1884, answered these same questions as follows:

" *Q.* 15. When last sick ?

" *A.* Never.

" *Q.* 16. Of what disease ?

" *A.* Never.

" *Q.* 17. Name of physician who last attended life proposed, and when ?

" *A.* No."

We have but little evidence of the circumstances under which or how this application was obtained. The application was not, however, filled out in the handwriting of the assured. All that Mrs. Brown can remember is that Mr.

Wyatt came there to take additional insurance, and thinks Dr. Kinney was with him. Thinks they both wrote something. Don't remember any questions that were asked, or seeing her daughter sign the application.

Dr. Kinney testified to making a medical examination May 17, 1884; the only time he was ever there with Wyatt. He asked her if she had ever suffered with any disease of the kidneys, and she told him she did not think she ever had, but a doctor in New York told her that she had some disease of the kidneys. He thereupon examined her, made up his mind she had no disease of those organs, and wrote "No" after the question. In the written medical examination of Dr. Kinney, introduced in evidence, it was stated that assured never had any illness, but that she had consulted Dr. Gilbert of Detroit and Dr. Jenks of Chicago concerning herself. There was considerable evidence introduced on the part of the defendant of statements of the assured that she was afflicted with disease of the kidneys. She died from "stoppage of her menses," as is shown by the proofs of death.

My brothers are of the opinion that, these answers being false, the court should have instructed the jury, as requested, that the second policy of insurance was void, and the plaintiff could not recover upon it. They hold that the insurance company was not bound to take notice of the answers made to the same questions in the application for the first policy, and was not precluded thereby from showing the evident untruth of the answers in the last application.

The court correctly instructed the jury as to sound health at the time the first application was made. The "sound health" evidently meant in the application is a state of health free from any disease or ailment that affects the general soundness and healthfulness of the system seriously, not a mere temporary indisposition which does not tend to weaken or undermine the constitution of the assured. The instruc-

tion that the disease must be of "serious nature" is objected to, and it may seem at first blush to be too strong a term to use; but it is difficult to perceive how a person can be in unsound health, or unsound condition of body or mind, without the disease that causes such condition is a serious one. If the affliction is of a permanent character, it must certainly be a serious one; and if it is merely temporary, and to pass away without serious results, it cannot well be said to render the person unsound in his general health.    The word "serious" is not generally used to signify a dangerous condition, but rather to define a grave, important, or weighty trouble.

It was claimed by the defendant, and the tenor of the evidence in its behalf was to the effect, that Victoria had Bright's or some other incurable disease of the kidneys.    If this were so, then she had not only a serious, but a dangerous, disease.    The court instructed the jury that, if they found the assured had any disease of a serious nature when she made the applications, the plaintiff could not recover.    We think the case was fairly put to the jury in this respect.

The court did not err in excluding the testimony of Dr. Childs.    He undertook to give a conversation between himself and the mother of Victoria as to her health, when he had already testified that he did not know the condition of Victoria, because he did not examine her, or have any conversation with her at all.    The conversation with the mother was clearly incompetent.    It was not offered to contradict or impeach Mrs. Brown, but as independent evidence of the girl's health.    It could not be received for that purpose.

The photograph of the girl, Victoria, was offered to show the healthy "appearance" of the assured.    This was clearly incompetent.    No objection was made to its admission, but, after it was received in evidence, an exception was taken. As a new trial must be had, it is not necessary to determine whether, under the particular circumstances of its use as evi-

dence in this case, there was error. No motion was made to strike it out of the case, and it does not appear that it was ever exhibited to the jury, or used in any way after the exception was taken.

A majority of the Court think that it was error to preclude Dr. Henderson from testifying in answer to the question as to whether or not he had ever treated the assured for typhoid fever. The fact as to treatment or non-treatment for this disease was not, under the circumstances of this case, a matter of privilege upon which the plaintiff could insist.[1]

It is further claimed that the court erred in permitting Mrs. Brown to testify to matters which varied and contradicted the written statements of the deceased as shown by the applications. Mrs. Brown certainly had the right to show by her testimony that the answers made by her daughter at the house were incorrectly written in by the agent after he went to his office, or that he filled in answers at such office that were not made at the house by Victoria. As such answers, if made by the agent, and not by Victoria, or with her knowledge or consent, could not bind her, the fact that they were so made could be established by parol. If the application had not been signed until filled out, a different rule might prevail.

The testimony of Dr. Kinney, in relation to what Victoria said about having kidney disease, and his conclusion from such examination that she did not have any disease of those organs, and his so stating in his written report of such examination, was admissible as proof tending to show that she was free from any such disease.

The court did not err in refusing to direct a verdict for the defendant upon both policies, but should have instructed the

[1] How. Stat. § 7516.—"No person duly authorized to practice physic or surgery shall be allowed to disclose any information which he may have acquired in attending any patient in his professional character, and which information was necessary to enable him to prescribe for such patient as a physician, or to do any act for him as a surgeon."

jury that the second policy was void, under the evidence.

The judgment must be reversed, and a new trial granted, with costs of this Court to the defendant.

The other Justices concurred.