MANHATTAN LIFE INS. CO. OF NEW YORK v. CARDER.

(Circuit Court of Appeals, Fourth Circuit. November 10, 1897.)

No. 225.

1. LIFE INSURANCE—FALSE REPRESENTATIONS.
The term "in good health," in a life insurance policy, is comparative; and an assured is in good health unless affected with a substantial attack of illness, threatening his life, or with a malady which has some bearing on the general health.

2. SAME—AUTHORITY OF AGENTS—NOTICE.
A life insurance company cannot defeat recovery on a policy by proof of restrictions and limitations, of which the assured had no notice, upon the authority and powers of its officers and representatives whom it had clothed with all the indicia of authority.

In Error to the Circuit Court of the United States for the District of West Virginia.

F. B. Enslow, for plaintiff in error.
Malcolm Jackson and John H. Holt, for defendant in error.

Before GOFF and SIMONTON, Circuit Judges, and PURNELL, District Judge.

SIMONTON, Circuit Judge.   This case comes up by writ of error to the circuit court of the United States for the district of West Virginia.   The action below was brought by Agnes S. Carder, an infant, by her next friend, against the Manhattan Life Insurance Company of New York.   The cause of action was a policy of life insurance on the life of her father, Albert S. Carder, of which she was the beneficiary.   The proceedings began in the state court, and were removed into the circuit court of the United States for the district of West Virginia.   The policy of insurance bears date the 17th of May, 1893, and is in the sum of $5,000.   It was issued upon the application of Albert S. Carder, which application contained his answers to a large number of questions, giving a very full account of his family and of himself.   At the end of his answers is the following warranty and contract:

"(90) It is hereby warranted that the above statements and answers are full, complete, and true in every particular, and they are offered as a consideration for the insurance applied for, which, however, shall not be forfeited for any misstatement made herein after three years from the date hereof.   And it is agreed that there shall be no contract of insurance until a policy shall be issued by the company, and accepted, subject to the conditions and stipulations therein contained, during the good health of the person to be insured, and the first premium paid thereon.   And all right and claim to paid-up insurance or reserve value of any kind, under the laws of any state or otherwise, except as provided in the laws of the state of New York or the policy, is hereby waived and released."

There is no dispute respecting the truth of any of the statements and answers made in his application.   The policy was issued and accepted, and the premium was paid thereon.   The questions in this case are, was it issued and accepted during the good health of the person insured?   If not, was this condition waived?   The cause was tried before a jury.   At the end of the testimony on behalf of the defendant as well as the plaintiff, the defendant entered a demurrer to the evidence.   Plaintiff joined in the demurrer, and the jury, under the instruction of the court, and in accordance with the practice prevailing in West Virginia, returned a verdict for the full amount claimed by the plaintiff, subject to the opinion of the court on said demurrer.   The court, having heard argument thereon, overruled the demurrer, and judgment was entered for plaintiff.   Exceptions were duly taken and assignments of error filed.   The questions in the case, as stated above, ordinarily would have been questions of fact to be answered by the jury under the instructions of the court.   The defendant, by its demurrer to the evidence, took these questions entirely from the jury, and placed upon the court the responsibility and duty of answering them.   The decision of the court necessarily was based on the testimony.   Our conclusion in the case must be made after a review of the evidence in the record.

Carder, the insured, was a dentist in the town of Huntington, W. Va.   He was approached in March, 1893, by J. L. Thompson, who was soliciting insurance in the defendant company.   Thompson was

an appointee of R. P. Woods, who was a state agent or manager of the defendant company, resident of Cincinnati, Ohio. Woods had authority to appoint Thompson as agent to solicit insurance. Thompson induced Dr. Carder to make application for insurance, superintended the preparation of the papers, and had an examination of the applicant made by a physician chosen by Thompson himself. The application went forward, and in due course two policies of insurance on the life of Carder were issued by the home office of the defendant company, and were sent to Woods, from whose possession Thompson received them. When the policies came, Thompson, being engaged elsewhere, sent them to Carder by an agent of his, named Henry. Carder refused to accept the policies. Soon after, Thompson decided to see Carder himself. To this end he went to Huntington, called at Carder's office, and learned that he was at his home. Going to the home of Carder, he found him in a bed chamber, lying on the bed in his night clothes, playing with his little daughter. With him also was Dr. Grooms, the physician who had examined him on behalf of the company when he made application for insurance. Introducing the matter of insurance, Thompson urged Carder to accept the policies. Carder excused himself on the ground that he had no money to pay for insurance, but offered his note. Thompson agreed to accept the note, went out, got a blank note, filled it up, got Carder to sign it, and thereupon delivered to Carder the policy for $5,000. Carder would not accept the other policy. This was on the 22d of June, 1893. Thompson noted Carder's condition, and came to the conclusion that he was not seriously sick; and, to his inquiry, Dr. Grooms said that Carder had a little trouble with his bowels, or something like that, and he thought he would be all right in a day or two. Several physicians have testified who attended Carder, and they all concur in the opinion that he had a slight gastric irritation of the intestinal canal, a disease not necessarily dangerous, and seldom or never fatal. His complaint gradually diminished, and he got up and about, went to his office, and attended to his business; never, however, apparently being wholly free of the gastric irritation. On the 12th of July, 1893, he took a family dinner with a friend. While there, he indulged in a bottle of beer, an unusual thing for him, and ate heartily of veal, sliced tomatoes, and watermelon. After eating dinner, he worked, and overheated himself. That night he was taken with cholera morbus, from which he died the next day. This cholera morbus was not the result of his previous indisposition, although it may have rendered him more susceptible to such an attack. Thompson had said nothing to Woods or to the company about finding Carder in bed when he delivered to him the policy. On the 22d of July he detailed to Woods the circumstances attending the delivery. A day or two after, Woods went to Huntington, and there learned for the first time that Carder was dead. On his return to Cincinnati, the 25th of July, he reported to the company all that he had heard from Thompson, and also the death of Carder. In the meanwhile he furnished to the administrator of Carder blank proofs of death, made a claim upon the administrator for the premium accruing during the quarter in which Mr. Carder died, stating at the same time that it must be either paid then or be deducted

from the sum due on the policy. The note given by Carder to Thompson was collected, and carried to the credit of the company; and a notification was sent out from the office of the company in New York, mailed to Dr. Carder, stating that the premium would fall due the 17th day of August, 1893, or else the policy would be forfeited, and after that the company concluded not to pay the policy. This was the 14th day of August, 1893. The authority of the agents of this company was strictly limited, and this fact was not communicated to the insured.

As has been seen, two questions arise under this state of facts: First. Was Dr. Carder in good health when the policy was accepted? Second. If not, was this waived by the company or any agent of it, so as to bind the company?

The term "in good health" is comparative. It does not mean in perfect health, nor would it depend upon ailments slight and not serious in their natural consequences. In construing this term in a life policy, we must regard the character of the risk assumed. Looking at it from this point of view, it would seem that a person was in good health unless he was affected with a substantial attack of illness, threatening his life, or with a malady which had some bearing on the general health; not a slight illness or a temporary derangement of the functions of some organ. See Connecticut Mut. Life Ins. Co. v. Union Trust Co., 112 U. S. 257, 5 Sup. Ct. 119.

In May, Ins. (2d Ed.) 387:

"Good health does not import a perfect physical condition. The epithet 'good' is comparative, and does not ordinarily mean that the applicant is free from infirmity. Such an interpretation would exclude from the list of insurable lives a large proportion of mankind. The term must be interpreted with reference to the subject-matter and the business to which it related. Slight troubles not usually ending in serious consequences, and so unfrequently that the possibility of such result is usually disregarded by insurance companies, may be regarded as included in the term 'good health.'"

"The term 'sound health,'" says the supreme court of Michigan in Brown v. Insurance Co., 65 Mich. 306, 32 N. W. 610, "when used in questions in applications for life insurance, means a state of health free from any disease or ailment that affects the general soundness and healthfulness of the system seriously, not a mere temporary indisposition, which does not tend to weaken or undermine the constitution of the assured."

The testimony of the physicians all concur in treating the ailment of Carder as temporary indisposition, which did not weaken or undermine his constitution. We are of the opinion that, within the meaning of the policy, he was in good health. This would seem to have been the conclusion of the agents of the defendant company. Thompson, who was charged with the delivery of the policy and the completion of the contract of insurance, saw Carder, and talked with him in the presence of his own examining physician. With full knowledge of his condition, he delivered the policy. Woods, a superior agent, the general agent of the company, after full information from Thompson of all that had occurred, went on, collected the money due upon the note given for the policy, made demand for the accruing

premium on the policy, sent on and saw to the preparation and the perfection of the proofs of loss, and seemed to entertain no other idea than that the policy would. be paid in full.    These agents were clothed with all the indicia of authority.    No notice of limitation on that authority was ever given to or known by the insured or his beneficiary, so far as .the record discloses.    Under these circumstances, the policy was properly accepted, and became a binding contract.    The conclusion thus reached renders further discussion of the second point unnecessary.    The judgment of the circuit court is affirmed, with costs.