[No. 7008. Decided November 9, 1907.]

FRITZ NOELLE, *Respondent*, v. HOQUIAM LUMBER & SHINGLE COMPANY, *Appellant.*[1]

MASTER AND SERVANT—FACTORY ACT—CERTIFICATE OF INSPECTION—EVIDENCE. The certificate issued by the commissioner of labor upon the inspection of a factory is only *prima facie* evidence that dangerous machinery therein has been guarded in compliance with the factory act.

WITNESSES—PRIVILEGED COMMUNICATIONS—PHYSICIANS—WAIVER. In an action for personal injuries, the plaintiff does not waive the right to object to testimony by his physician by the fact that he himself testified as to the cause and extent of his injuries and described them as he saw and felt them, without reference to what his physician told him; Bal. Code, § 5994, subd. 4, prohibiting such testimony by a physician without the consent of his patient (ROOT, J. and HADLEY, C. J., dissenting).

Appeal from a judgment of the superior court for Chehalis county, Irwin, J., entered March 25, 1907, upon the verdict of a jury rendered in favor of the plaintiff, in an action for personal injuries sustained by an employee in a sawmill. Affirmed.

*R. S. Eskridge, Philip Tindall,* and *William E. Campbell,* for appellant.

*Govnor Teats* and *H. J. Hughes,* for respondent.

MOUNT, J.—Respondent recovered a judgment against the appellant on account of personal injuries received while working in appellant's mill. The appellant presents two principal questions for our consideration. The first is that a certificate of approval, issued by the commissioner of labor under the factory act of 1905, is conclusive of the facts therein certified to by that officer. The second, that where the plaintiff described his injuries without reference to what his attending

[1]Reported in 92 Pac. 372.

physicians told him, he thereby waived the privilege of secrecy enjoined by statute upon the physicians.

The first question was determined by us in *Vosberg v. Michigan Lumber Co.*, 45 Wash. 670, 89 Pac. 168, where we said:

"But the statute itself (Laws 1905, page 164, § 7) makes the certificate only prima facie evidence of a compliance with the provisions of the act, and the court performed its full duty in this respect when it charged the jury to the effect that the certificate was prima facie evidence of a compliance with the statute, and that the burden was on the respondent to overcome that evidence by showing that the gearing causing the injury was not reasonably safeguarded."

See, also, *Noren v. Larson Lumber Co.*, 46 Wash. 241, 89 Pac. 563; *Boyle v. Anderson etc. Lumber Co.*, 46 Wash. 431, 90 Pac. 433. The act is clear upon the question, and we have no desire to modify our opinion in the cases cited.

Upon the other question, the plaintiff at the trial testified as to the character of the injuries he received, but did not testify in regard to what the physician who cared for his wounds told him, or as to what the physician did for him. Dr. Campbell, who attended the plaintiff from the outset and who dressed the wounds at the hospital the first time, died shortly before the trial. Two other physicians, who were connected with the hospital, who were associated with Dr. Campbell, and who helped to dress the wounds, were present at the trial. These doctors were called as witnesses by the appellant to testify to the extent of respondent's injury, but upon respondent's objection, the court excluded their evidence under the statute relating to privileged communications. Bal. Code, § 5994 (P. C. § 940). It is argued by appellant that this ruling was error, for the reason that the respondent himself having testified as to the character and extent of the injury he thereby waived his privilege in regard thereto. The statute is as follows:

"The following persons shall not be examined as witnesses: . . . 4. A regular physician or surgeon shall not, without

the consent of his patient, be examined in a civil action as to any information acquired in attending such patient, which was necessary to enable him to prescribe or act for the patient; . . ."

It is clear that, with the consent of the patient, his physician may be called and divulge all the information he has learned in his professional capacity; otherwise not. Many authorities are cited by appellant to the effect that, where the patient himself calls the physician as a witness and permits him to testify concerning the ailment, treatment, and the advice given, this constitutes a waiver of the privilege; and also where the patient testifies to what happened in the presence of the physician or the advice and treatment given or statements made by the physician, the privilege is also waived. The cases so holding are based upon the reason that the patient himself, by testifying in regard to facts which he might have kept secret, thereby breaks the seal of privilege and waives the right to object, because the statute does not intend that such privilege shall be used both as a sword of offense and at the same time as a shield of defense.

No case has been called to our attention which holds that a person may not describe his injuries as he sees and feels them, without a reference to what his attending physician or surgeon may have told him, and that an adverse party may then call such physician and prove by him that the patient is mistaken or has testified untruthfully. On the other hand, the supreme court of Montana, in the case of *May v. Northern Pac. R. Co.*, reported in 32 Mont. 522, 81 Pac. 328, 70 L. R. A. 111, which is a case very much like this, under a statute like ours, held that a patient, by testifying to the cause of her injuries and their nature and extent, did not thereby waive the privilege granted by the statute. This is a well-considered case and many of the authorities are there collected and discussed. It is directly in point, and the conclusion of that court upon this question accords with our views, and is, we believe, in accord with the weight of authority.

It is perhaps true, as argued by appellant, that the injured party and the attending physician may be the only persons who have knowledge of the extent of an injury, and that if the physician may not testify thereto, great injustice may be done. This, of course, argues against the policy of the statute, which rests with the legislature and not with the courts, and would annul the provisions of the statute entirely. The legislature made no exception to the rule of secrecy where it was necessary to contradict falsehood, but provided for an exception only in case of consent of the patient. No doubt sufficient reason appeared why this should be the only exception. We think the court did not err in excluding the evidence of the attending physician.

The judgment must therefore be affirmed.

CROW, DUNBAR, RUDKIN, and FULLERTON, JJ., concur.

ROOT, J. (dissenting)—I dissent from that portion of the opinion that holds that a physician and surgeon cannot testify to the nature and extent of an injury to a patient after the latter has himself voluntarily testified thereto. The statute in question, being in derogation of common law, must be strictly construed against him who invokes its aid. The purpose of a trial is to elicit the truth. The truth, when material to an issue, should be suppressed only when its utterance would contravene some recognized principle of public policy. A physician is properly prohibited from revealing the secrets of his patient. Public policy requires that persons needing the advice or professional assistance of a physician or surgeon should know that they may consult and employ one without any fear of their ailment or condition becoming known by reason of anything such medical man may do or say. But when the patient himself reveals to the world the nature and extent of his injury or ailment, there remains no longer any occasion for secrecy. He in effect says that he no longer desires to keep the matter a secret. When, in a case like this, he so testifies and seeks by that testimony to obtain money

from another because of that condition, the truth of the matter becomes of much more importance than the useless silence of the doctor.

After this respondent voluntarily testified to his condition, what reason remained for keeping the doctor silent? What public policy held the lips of the physician as to a matter which the patient had publicly proclaimed? If the patient upon the witness stand told the truth, the doctor, it may be presumed, would have corroborated him. If the patient testified falsely, is it public policy to shield him and make his injury triumphant by suppressing the truth which the doctor would be presumed to give? Is this statute intended as an invitation to perjury and a cover for fraud? The statute is a good one; but it was not intended as a shield for perjury, fraud, and dishonesty. After this respondent went upon the witness stand and voluntarily testified about his wound, the matter was no longer a secret. He made it public. It being by him thus published to the world, the injunction of secrecy no longer rested upon the doctor. When the reason of a rule or statute fails, the application of the rule or statute fails. The liberty and property of the citizen must often depend upon his ability to establish in court the truth of a given matter. If he is refused the right to furnish testimony showing the truth, he is thereby, in effect, deprived of his liberty and property. Such a result can be tolerated under our form of government only where there is a well-recognized public interest which demands the suppression of the truth.

In support of these views, I may cite from many authorities the following: In the case of *Hall & Paulson Furniture Co. v. Wilbur*, 4 Wash. 644, 30 Pac. 665, this court spoke as follows:

"Wilbur, one of the appellants, was required on cross-examination to answer questions tending to disclose what advice his attorney gave him concerning the advisability of resisting the respondent's demands. . . . But the course permitted by the court did not violate the rule as to confidential commu-

nications between attorney and client, because the client himself first opened the matter."

In the case of *Hunt v. Blackburn,* 128 U. S. 464, 9 Sup. Ct. 125, 32 L. Ed. 488, the supreme court of the United States, in dealing with the principle here involved, although in a case not so strongly for the appellant as this, said:

"But the privilege is that of the client alone, and no rule prohibits the latter from divulging his own secrets; and if the client has voluntarily waived the privilege, it cannot be insisted on to close the mouth of the attorney. When Mrs. Blackburn entered upon a line of defence which involved what transpired between herself and Mr. Weatherford, and respecting which she testified, she waived her right to object to his giving his own account of the matter."

The court of appeals of New York, in *McKinney v. Grand Street etc. R. Co.,* 104 N. Y. 352, 10 N. E. 544, used this language:

"The patient cannot use this privilege both as a sword and a shield, to waive when it enures to her advantage, and wield when it does not. After its publication no further injury can be inflicted upon the rights and interests which the statute was intended to protect, and there is no further reason for its enforcement. The nature of the information is of such a character that when it is once divulged in legal proceedings, it cannot be again hidden or concealed. It is then open to the consideration of the entire public, and the privilege of forbidding its repetition is not conferred by the statute. The consent having been once given and acted upon cannot be recalled, and the patient can never be restored to the condition which the statute, from motives of public policy, has sought to protect. . . . The object of the statute having been voluntarily defeated by the party for whose benefit it was enacted, there can be no reason for its continued enforcement in such case."

*Webb v. Metropolitan Street R. Co.,* 89 Mo. App. 604, was a case wherein the court of appeals of Missouri expressed its views upon this question as follows:

"She voluntarily lifted the veil of secrecy by going on the stand and testifying to the different treatments of the differ-

ent doctors.   She was allowed to fortify her case in this way by the silent testimony of those whose acts and words (indirectly) she invoked, but whose mouths she closed by the shield of the statute.   If such be the law, it can be made destructive to the rights of third parties.   There would be no safety against its evil tendencies in the hands of unscrupulous persons.   That which was intended by the legislature to hide, as with a veil, the secret and sacred confidences of the sick room, should not be used as a snare for the judge and jury.   There was a want of candor and fairness in such a course that at once challenges the sense of justice.   It is a game of hide and seek, to be played by one side alone, to the utter helplessness and confusion of the other side.   A sense of judicial responsibility forbids us giving our consent to a rule that, on its face, is so unfair and so unjust.   He who invokes the statute must do so with the full and unqualified understanding that it is a shield to him and not a sword for others.   That its beneficent object is to protect him in his rights and not to impair those of his adversary.   We hold that the physicians, whose evidence was offered, were competent witnesses under the facts."

The supreme court of Nevada, in *State v. Depositor*, 21 Nev. 107, 25 Pac. 1000, said:

"Her testimony was of a nature to make public all matters bearing upon the injuries and sufferings of the child as affected by the defendant's acts.   It practically disclosed the general nature of the complaint for which the physician prescribed.   If any injury could be inflicted by testimony of this nature it was done by the mother's testimony, and, the facts having once been exposed, it would seem that there was no reason why the physician's knowledge should be treated as confidential."

In *Lane v. Boicourt*, 128 Ind. 420, 27 N. E. 1111, 25 Am. St. 442, the supreme court of that state gave this expression:

"The testimony given by the witnesses of the appellee broke the seal of privacy, and gave publicity to the whole matter. The patient waived the statutory rule.   The course pursued laid the occurrence open to investigation.   Nothing was privileged, since all was published.   The statute was not meant to

apply to such a case as this, nor is it within the letter or the spirit of the law. If a patient makes public in a court of justice the occurrences of the sick room for the purpose of obtaining a judgment for damages against his physician, he cannot shut out the physician himself, nor any other who was present at the time covered by the testimony. When the patient voluntarily publishes the occurrence, he cannot be heard to assert that the confidence which the statute was intended to maintain inviolate continues to exist. By his voluntary act he breaks down the barriers, and the professional duty of secrecy ceases. It would be monstrous if the patient himself might detail all that occurred, and yet compel the physician to remain silent. The principle is the same whether the physician called is a consulting physician, or is the defendant. The opening of the matter to investigation removed the obligation of secrecy as to all, not merely as to one. When the obligation to silence is broken, it is broken for the defendant as well as for the plaintiff."

The supreme court of New York, in *Schlotterer v. Brooklyn etc. Ferry Co.*, 89 App. Div. 508, 85 N. Y. Supp. 847, discussed the question in this manner:

"The purpose of the statute is to cover the relation of physician and patient with the cloak of confidence. But the purpose is to save the patient from possible humiliation or distress, not to enable him to win a lawsuit. . . . In my opinion, the language of the statute does not authorize a construction which affords the privilege notwithstanding the reason for its continuance has ceased to exist."

In *Rauh v. Deutscher Verein*, 29 App. Div. 482, 51 N. Y. Supp. 985, the court expressed itself as follows:

"And it would appear to be equally unfair and unreasonable to allow a plaintiff—the one most interested in the recovery—to testify to what took place at the time of the examination by the physicians, or of the operations that were performed or the treatment received, and at the same time enjoin silence upon the physician. A physician, when called, may be said to be, under ordinary circumstances, a disinterested witness. His professional position and his reputation would of themselves be a pledge for his not intentionally violating his oath, and generally he would have no great object

in making a false statement as to the result of his investiga-
tions, while his professional knowledge would enable him to
state correctly the result of his investigation and the treat-
ment he prescribed or the operations he performed. In the
case, however, of a plaintiff, irrespective of the interest that
he would have in coloring the testimony to suit his case, his
lack of professional knowledge would expose him to mistakes
in testifying, and would make it quite possible, with the utmost
good faith on the part of the party testifying, that the testi-
mony would be grossly misleading. It must be apparent that
such a rule would work the greatest injustice, and would ex-
pose the defendant to danger on account of the fact that the
rule would prevent him from examining into the truth of the
plaintiff's statements. . . . The physician would cer-
tainly be allowed to contradict the fact testified to by plain-
tiff. . . . We think, therefore, it was error to exclude
the testimony of this physician to the condition of the plain-
tiff when she came to the hospital, and as to the operations he
performed upon her, and the result of these operations."

In the case of *Morris v. New York etc. R. Co.*, 148 N. Y.
88, 42 N. E. 410, 51 Am. St. 675, the court of appeals of
New York used this language:

"It is a case where two physicians attended the patient,
both holding professional relations to her, and in a suit in
which the nature and extent of her injuries (as then appear-
ing) is the important inquiry, she calls one of them and the
defendant the other. She has the right, unquestionably, to
avail herself of the testimony of the one which she thinks will
be the most favorable for her case, but the question is whether
she can at the same time deprive the defendant of the benefit
of the testimony of the other. . . . In this case it was
the privilege of the plaintiff to insist that both physicians
should remain silent as to all information they obtained at
the consultation, but she waived this privilege when she called
Dr. Payne as a witness and required him to disclose it. The
plaintiff could not sever her privilege and waive it in part and
retain it in part. If she waived it at all it then ceased to exist,
not partially, but entirely. The testimony of Dr. Payne hav-
ing been given in her behalf, every reason for excluding that
of his associate ceased. . . . We think that a construc-
tion of the statute which permits a patient who has been at-

tended by two physicians at the same examination or consultation to call one of them as a witness to prove what took place or what he learned, thus making public the whole interview, and still retain the right to object to the other, is unreasonable and unjust, and should not be followed. The waiver is complete as to that consultation when one of them is used as a witness. The considerations and reasons upon which the statute was founded no longer exist when full disclosure is made by either with the consent of the patient, and every party to the transaction thus disclosed is relieved from any injunction of secrecy. . . . Upon every principle of reason and justice this act amounted to a waiver of the right to object to the testimony of the other physician when called by the defendant, as to the same transaction."

In *Treanor v. Manhattan R. Co.*, 28 Abb. New Cas. 47, this language is employed:

"Although the statute prescribes an express waiver, the court of appeals has decided that it may be inferred from conduct. . . . The thing forbidden by the code is the disclosure of professional information, and the policy of the enactment is to protect patients in the free revelation of their maladies to their physician. But what if in order to enforce a claim against a stranger, the patient himself promulgate the information, and uncovers his maladies and infirmities in court; does he not thereby break the seal of secrecy and absolve the physician from the obligation of silence? Does he not, in the strictest and most emphatic sense, waive his privilege? Is it to be tolerated that, to mulct another in damages, he may inflame a jury with a false or exaggerated story of his injuries and suffering, and yet a physician whom he has consulted is not to be allowed to prevent the meditated injustice by a truthful statement of the case?"

Greenleaf, Evidence (16th ed.), Vol. 1, § 247a, contains the following:

"As to the policy of the privilege, and of extending it, there can only be condemnation. The chief classes of litigation in which it is invoked are actions on policies of life insurance, where the deceased's misrepresentations as to health are involved; actions for corporal injuries, where the plaintiff's bodily condition is to be ascertained; and testamentary ac-

tions, where the testator's mental condition is in issue.  In all of these cases the medical testimony is 'the most vital and reliable,' 'the most important and decisive,' and is absolutely needed for purposes of learning the truth.  In none of them is there any reason for the party to conceal the facts except to perpetrate a fraud upon the opposing party, and in the first two of these classes the advancement of fraudulent claims is notoriously common.  .  .  .  In litigation about wills, policies, and personal injuries, the privilege, where it exists, is known in practice to be a serious obstacle to the ascertainment of truth and a useful weapon for those interested in suppressing it."

Wigmore, Evidence, Vol. 4, at §§ 2380, 2388, and 2389, discusses the question at length, making, among others, the following observations:

"That the relation of physician and patient should be fostered no one will deny.  But that the injury to that relation is greater than the injury to justice—the final canon to be satisfied—must most emphatically be denied.  The injury is decidedly in the contrary direction.  Indeed, the facts of litigation today are such that the answer can hardly be seriously doubted.  Of the kinds of ailments that are commonly claimed as the subject of the privilege, there is seldom an instance where it is not ludicrous to suggest that the party cared at the time to preserve the knowledge of it from any person but the physician.  From asthma to broken ribs, from ague to tetanus, the facts of the disease are not only disclosable without shame, but are in fact often publicly known and knowable by every one—except the appointed investigators of truth.  The extreme of farcicality is often reached in litigation over personal injuries,—in the common case, a person injured by a street-car amid a throng of sympathizing onlookers.  Here the element of absurdity will sometimes be double; in the first place, there is nothing in the world, by the nature of the injury, for the physician to disclose, which any person would ordinarily care to keep private from his neighbors; and, in the second place, the fact which would be strenuously secreted and effectively protected, when the defendant called the plaintiff's physician and sought its disclosure, would be the fact that the plaintiff was not injured at all!  Upon such

foundation of vain imaginations is the privilege reared. The injury to justice by the repression of the facts of corporal injury and disease is a hundred fold greater than any injury which might be done by disclosure.   .   .   .

"The privilege may be waived, like all other privileges. It is astonishing to find that this question could ever have been regarded as debatable. Nothing but a confusion of fundamental ideas could ever create any doubt.   .   .   .   A waiver is to be predicated, not only when the conduct indicates a plain intention to abandon the privilege, but also when the conduct (though not evincing that intention) places the claimant in such a position, with reference to the evidence, that it would be unfair and inconsistent to permit the retention of the privilege.   .   .   .

"In the first place, the *bringing of an action* in which an essential part of the issue is the existence of physical ailment should be a waiver of the privilege for all communications concerning that ailment. The whole reason for the privilege is the patient's supposed willingness that the ailment should be disclosed to the world at large; hence the bringing of a suit in which the very declaration, and much more the proof, discloses the ailment to the world at large, is of itself an indication that the supposed repugnancy to disclosure does not exist.   .   .   .   In actions for *personal injury*, the permission to claim the privilege is a burlesque upon logic and justice.   .   .   .   The *party's own voluntary testimony*, on trial, to his physical condition in issue, should be a waiver of the privilege for the testimony of a physician who has been consulted about the same physical condition in issue;   .   .   .   Certainly it is a spectacle fit to increase the layman's traditional contempt for the chicanery of the law, when a plaintiff describes at length to the jury and a crowded courtroom the details of his supposed ailment and then neatly suppresses the available proof of his falsities by wielding a weapon nominally termed a privilege."

See, also, *Lawson v. Morning Journal Ass'n*, 32 App. Div. 71, 52 N. Y. Supp. 484; *Hennessy v. Kelley*, 30 Misc. Rep. 703, 64 N. Y. Supp. 562; *Marx v. Manhattan R. Co.*, 10 N. Y. Supp. 159; *Rauh v. Deutscher Verein, supra; Brown v. Metropolitan Life Ins. Co.*, 65 Mich. 306, 32 N. W. 610, 8 Am. St. 894; *Campau v. North*, 39 Mich. 606, 33

Am. Rep. 433; 23 Am. & Eng. Ency. Law (2d ed.), 91; 4 Current Law, p. 1955; *Highfill v. Missouri Pac. R. Co.,* 93 Mo. App. 219; *Lane v. Boicourt, supra.*

Both upon principle and authority, I think the physician should have been permitted to testify.

HADLEY, C. J., concurs with Root, J.