## Hadler, Executrix, v. Prudential Insurance Company of America

*Benjamin F. Stone* and *James Stone*, for plaintiff.

*Kelly & Kelly* and *Vosburg & Vosburg*, for defendant.

SMITH, P. J., July 25, 1932.—This action was based upon an insurance policy upon the life of John Hadler, issued by the defendant February 26, 1930, agreeing to pay the sum of $298 upon receipt of due proofs of death, etc. The said John Hadler died September 7, 1930.

Defendant denied liability in its affidavit of defense, in which, after quoting the following provision in the policy, viz., "Preliminary Provision: This policy shall not take effect if the insured die before the date hereof, or if on such date the insured be not of sound health, but in either event the premiums paid hereon, if any, shall be returned." It is stated "that at the date of issuance of said policy, to wit, February 26, 1930, the insured was not in sound health, but on the contrary was and had been for some time prior thereto suffering from a serious and incurable disease known as sarcoma of the leg;" and for which he had been previously operated upon, and amputation of the leg advised but not performed.

As stated in the affidavit of defense—and as to it only was there evidence pro and con at the trial—this denial of sound health of the assured was the only defense interposed.

The assured was a boy ten years of age. The case was submitted to the jury after refusal of requests of both plaintiff and defendant for binding instructions. A verdict was rendered in favor of the plaintiff for the sum of $323.33, and the jury returned therewith their answers to the following special requests for findings of fact furnished them at the request of the defendant's attorney, viz.: (1) "Was John Hadler, on the date of the policy, in good health? Answer: Yes." (2) "Was John Hadler, when the policy was issued, suffering from an incurable disease known as sarcoma? Answer: No."

Whereupon, on application of the attorney for the defendant, the present rules for judgment n. o. v. for defendant and for new trial were allowed.

It is conceded that the defense interposed, if proved, is a complete bar to the right of recovery, and of this we have no doubt as the correct interpretation of the terms and provisions of the policy sued upon.

"It is important to know what is meant by the term "sound health." "Good health" and "sound health" are terms interchangeable and of the same general meaning. The former is thus defined: "When used in a policy of life insurance, means that the applicant has no grave, important or serious disease, and is free from any ailment that seriously affects the general soundness and healthfulness of the system:" Barnes *v*. The Fidelity Mutual Life Ass'n, 191 Pa. 618, cited and approved in later Pennsylvania Supreme and Superior Court decisions and in 14 R. C. L. 1069, note, and numerous cases from other jurisdictions sup-

porting the text, where it is stated: "A warranty that the insured is in good or sound health is not broken unless the insured has an ailment of a character so well defined as appreciably to affect his health." We do not need to go outside of Pennsylvania for authority, but the language of Chase, J., in Packard v. Metropolitan Life Ins. Co., 72 N. H. 1, is worth quoting: "Speaking generally, they [the words 'sound health'] mean the absence of any vice in the constitution and of any disease of a serious nature that have a direct tendency to shorten life; the absence of a condition of health that is commonly regarded as disease, in contradistinction to a temporary ailment or indisposition." To the same effect is Manhattan Life Ins. Co. of N. Y. v. Carder, 82 Fed. 986, 989, per Simonton, J.

The disease attributed to the assured in the case at bar, diagnosed and testified to by the two physicians called by the defendant who had treated him for the same, they call "sarcoma" and explain its character. Does this evidence give it the character of a disease disproving "sound health" of the assured at the time of the issuance of the policy in question?

Dr. Noacker, who treated him in the state hospital at Scranton from his entry there, October 11, 1929, to his discharge, November 16, 1929, testifies to a micro-examination of the trouble on the leg of the patient made in the laboratory under his direction, and diagnoses it as a "species of sarcoma" of a "malignant" nature, "incurable," "always of a progressive character," which means that it "does not stay in the place where discovered." Illustrating this, he said: "In this case what I discovered in the leg may next be discovered in the lungs or in the brain or in the bones or the spinal column." On cross-examination, he said that he "never saw one of this nature cured," referring to the affliction by the term "tumor;" he testified that in "one of this type" he could not obtain favorable results by "the application of caustics and scraping away the growth." When asked if the boy "was discharged as cured," he answered: "No, he was discharged as relieved."

Dr. Martin, also defendant's witness, testified he treated the assured in St. Joseph's Hospital from March 28, 1930, to April 19, 1930, for "sarcoma of the left leg" and removed the tumors, learning from the assured of his previous operation and treatment at the state hospital and by Dr. Noacker, and declared the disease "incurable," and "a very progressive disease," "generally resulting in death," because it travels to some other portion of the body; that a microscopic examination would be necessary to determine its "malignancy;" that caustics and scraping of the bone "would relieve the symptoms, but they usually come back."

On cross-examination, the witness said in answer to a question, after previously stating that "it usually travels:" "Q. By that you mean, I presume, that in some cases it does not travel? A. Never heard of one that didn't." He added that the "traveling" would affect the patient by a "weakened condition—weakening the patient."

Dr. Noacker testifies the wound on the leg had healed when the patient was discharged from the hospital and was so at the time of Dr. Martin's subsequent treatment as he testifies.

There were no medical experts called as witnesses by the plaintiff except Dr. Noacker. The testimony by Mrs. Mamie Hadler, the present plaintiff and the mother of the deceased assured (with whom he resided at all times except when in the hospitals under treatment, as testified by the defendant's medical witnesses from whose evidence we have above quoted), and by Michael J. Connolly, a neighbor who was her only witness, was concerning the physical appearance of the boy in his employment and activities, describing the same quite in detail—that he ran around, played at home and at school as other children,

attended school regularly except when kept at home because of his mother's illness, helped in the home and ran errands, without any limping, and never complained of not feeling well.

At the close of the testimony of the last two witnesses, the attorney for the plaintiff recalled Dr. Noacker as his witness and propounded to him a hypothetical question, to which he replied: "In cases of sarcoma, after the first operation, if all the possible tissues that are contaminated are removed, a child may remain well for three or four months, when all of a sudden there is a breaking out, not necessarily here where the boy had it the first time, but, as I stated before, either in the lungs, or in the brain, or in the spinal cord, so that once infected with sarcoma you are always infected till you die," and, again, that "the time when death follows would be very uncertain." In this connection it would be noticed that the certificate of death by the attending physician in evidence recites the indirect cause of death of the assured was "ostic sarcoma."

The disease of sarcoma, diagnosed and described as affecting the assured and from which he died, was a disease of a serious nature affecting the general soundness and healthfulness of his system "such as to indicate a vice in the constitution, or be so serious as to have some bearing upon the general health and the continuance of life:" Csizik v. Verhovay Sick Benefit Ass'n, 60 Pa. Superior Ct. 466, 474; and not a mere temporary indisposition. It is a disease in which the germs of progression and continuance to final fatal results continue in the system. If this testimony be true, then the warranty of "sound health" recited in the policy could not have been true at the time of its issuance, although it was only discoverable by microscopic examination of tissues in a medical laboratory by medical and chemical experts, such as the witnesses for the defendant at bar, and was such as could not be discovered by outward observation by any one, especially laymen and nonexperts.

The acceptance of the policy in question effects a warranty of the truth of the statement of "sound health," the same as if such declaration by the assured had been expressly made and its truth warranted in a formal application made as it is the practice of some life insurance companies to require, and "the prevailing view, however, seems to be that a warranty that the answers in an application for a life insurance policy are true is broken by the existence of a disease, whose existence is denied in the application, *even though the applicant did not know of its existence*" (italics ours) : 14 R. C. L. 1070, and citations in note two. Directly in point is Standard Life and Accident Ins. Co. v. Sale, 121 Fed. 664, where it is stated in the syllabus: The answer, "I am in sound condition mentally and physically, except as herein stated," were warrants and not mere representations resting on the belief of the assured, and if the fact is not as so stated the warranty is breached, and it makes no difference that insured acted in good faith in making the statement. "The law is settled that the insurer may require the applicant to warrant himself to have been and to be sound in health, within the meaning of such questions as we are considering; and the applicant, if he chooses to accept the insurance upon those terms, is bound by them," per Severens, C. J., at page 668.

The existence of the disease of "sarcoma" with its features, symptoms and consequences having been testified to by medical witnesses qualified to testify to its obscurity from discovery except by methods available only to such experts, in the absence of any expert evidence contra we are of the opinion that the evidence of the two lay witnesses for the plaintiff was not sufficient to overcome this medical testimony and to submit the case to the jury's consideration. We are unable to reach a contrary conclusion from the authorities cited by the learned attorney for the plaintiff in his brief considering the entire evidence

there adduced, and which was held sufficient to go to the jury. We consider them distinguishable from the case at bar. Therefore, we make the following

### Order

And now, to wit, July 25, 1932, rule for judgment n. o. v. in favor of the defendant is made absolute, and rule for new trial discharged.

From Gerritt E. Gardner, Montrose, Pa.