ELMER v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. September 1, 1919.)

No. 5386.

1. ARMY AND NAVY ☞40—RESPONSIBILITY FOR SEDITIOUS PUBLICATIONS.

In prosecution for willfully obstructing the recruiting and ·enlistment service of the United States by writing and causing to be printed and published a certain article, evidence *held* insufficient to warrant jury finding that article was intentionally ·published or caused to be published by defendant, who was not the owner, editor, or publisher of the paper.

2. CRIMINAL LAW ☞730(14)—REMARKS BY COUNSEL PREJUDICIAL WHERE JURY NOT INSTRUCTED TO DISREGARD.

Remarks made by counsel for the government in a prosecution for sedition, in his· argument to the jury, that he would kill a man who made similar statements, etc., was prejudicial, where the jury was not instructed to disregard them, although the court stated that the remarks were improper.

In Error to the District Court of the United States for the Eastern District of Missouri; Thomas C. Munger, Judge.

Criminal prosecution by the United States against William P. Elmer. Judgment of conviction, and defendant brings error. Reversed.

Chester H. Krum, of St. Louis, Mo., for plaintiff in error.

Vance J. Higgs, Sp. Asst. Atty. Gen., for the United States.

Before SANBORN and CARLAND, Circuit Judges, and YOUMANS, District Judge.

CARLAND, Circuit Judge. [1] The plaintiff in error, hereafter called defendant, was convicted and sentenced upon the second count of an indictment which charged that defendant on February 21, 1918, in the county of Dent, state of Missouri, had willfully obstructed the recruiting and enlistment service of the United States, by then and there writing and causing to be printed and published in a newspaper called the Republican, printed and published at Salem, in said county and state, the editorial and article set forth in said count. At the close of all the evidence counsel for defendant moved for a directed verdict in his favor. In response to this motion the court said:

"I do not think I can agree with you, Judge Krum. The evidence is sufficient, I think, on the question of authorship, to require a jury's interposition rather than the court's declaration as to who should be believed."

The motion was thereafter formally denied, and this ruling is assigned as error. In view of the response of the court, it is pertinent to remark that authorship alone would not constitute the offense charged against the defendant. The important question is: Did the defendant intentionally cause the article to be printed and published? The evidence on the part of the United States upon this point was as follows:

After the publication of the article, a warrant was issued for John W. Roberts, the owner of the newspaper, whereupon the defendant visited the office of the United States Attorney for the Eastern district of Missouri, on two or three different occasions, in the interest of Roberts. Mr. B. L. White, Assistant United States Attorney, testified that on one or more of these occasions the defendant told him—

"that he had written and published the article himself, and that he desired to assume all responsibility for it, and to relieve Mr. Roberts from all possible blame for it."

The defendant and two other witnesses, Babler, who was present on one occasion, and Farris, who was present on another, when it was claimed the above statement was made, denied the same. M. F. Roberts, a witness for the United States testified as follows:

"Q. State your name. A. M. F. Roberts.

"Q. Where do you live? A. At Salem, Mo.

"Q. Mr. Roberts, do you know this defendant, William P. Elmer? A. Yes, sir.

"Q. Do you remember, at any time after the 28th day of February of this year, hearing any statements made by this defendant in the post office building at Salem, with respect to the writing of the editorials in connection with some charge made against Mr. Roberts? A. Yes, sir.

"Q. Will you state to the jury what it was that you heard this defendant say on that occasion? A. I heard Mr. Elmer say in the post office building that he had written those articles, and was responsible for it himself, and not John Roberts; it was a well-known fact that John Roberts had been in Oklahoma since early in December."

As the testimony of Roberts related only to authorship and responsibility, it has little, if any, value upon the question of publication, as authorship would not constitute the crime charged, and responsibility is a legal conclusion which might be incorrect. This was all the evidence offered by the United States upon the question of publication. The undisputed evidence as to just how the article came to be published came from the defense, and is as follows:

The defendant is a lawyer, residing at Salem, Mo., engaged in the practice of his profession in that vicinity. The Republican newspaper was a weekly paper, issued on Thursday of each week. Seven or eight years prior to the trial of defendant he had been the owner thereof. At the time of the publication of the article in question it was owned by one John W. Robers, who was its editor, but who was absent from Salem. Curtis & Grosse were its publishers, as lessees from Roberts. The defendant was writing editorials for the paper in February, 1918,

as an accommodation to Roberts. The original letter or paper, of which the article published was a part, was received by the newspaper through the mail. The defendant corrected and remodeled the same, and wrote the words "Pray or Bray" as a heading. The paper was then typed by Miss Pugh, a stenographer in the employ of defendant, and after it was typed it was hung on a hook in the law office of defendant, either by the stenographer or the defendant. The law office of defendant and the newspaper office are different offices, and as we understand the testimony are not located in the same building.

Defendant had no personal knowledge, as to how the article got out of his office. He never directed any one to take it from the hook and deliver it to the newspaper office, never directed anybody to publish it, and did not know that it had been published until some time after its publication. Defendant left Salem on February 10th, and went to Kansas City to attend a banquet given to celebrate Lincoln's birthday. When coming back from Kansas City, he met Mr. Stevens at Cuba, and they both went on to St. Louis, and remained there the remainder of the week. The article was taken from defendant's office in some way during his absence. When Mr. Roberts was running the paper himself, defendant wrote editorials for him. He would write them, and give them to Mr. Roberts, and if he (Roberts) wanted to publish them it was all right, and if he did not he would throw them into the waste basket. Defendant had two hooks in his own office; one was called the live hook, and the other the dead hook. Roberts and defendant had an understanding that nothing should be taken from the dead hook. The article in question was placed upon the dead hook.

Miss Pugh, the stenographer heretofore referred to, testified:

That the article in question was laid on her desk by the defendant himself, and that she typed it and hung it on the copy hook. There were two hooks, following the fashion of a newspaper office—one called the live hook, and one the dead hook. On the live hook was the matter to be published in the paper, and on the dead hook was kept matter that was for reference, or that might be used later on; but the dead hook, at the time the defendant was away from the office, was the only hook that was on the inside of the office. Outside in the hall was another hook, that was called the live hook. The printers could come and get matter from the live hook when the defendant or witness were out of the office. "If the doors were locked, they could come upstairs into the hall and take what we called live matter from the live hook. The article in question as typewritten by me was placed on the dead hook, which was on the inside of the office in the inner hall. At the time the defendant was away, I handed the copy of the article in question out of the office myself."

Witness had never received any direction from the defendant to hand the article to any one for publication. The witness further testified:

That, when the defendant left for the Young Republican Club, the usual meeting in Kansas City, he handed or caused to be handed to the paper all the editorial copy he thought they would need for that issue of the paper, and he thought he would be back in time to prepare the other for them before the next issue; but he did not come home as he expected from Kansas City and stayed longer than had been planned. The boys at the office—"newspaper office"—after the paper was off the press on Thursday, February 14, "came to me to know if there was any copy. They like to begin Friday and Saturday.

days they are not busy, on editorial matter, and they keep the days before publication for local and more timely matter. So, without thnking that I had not asked the defendant if he had left any extra copy for the boys, I went to the hook, and, knowing that I had typed this article, I thought that I would just turn over the matter that I had typed, and I took off perhaps a half dozen of these typed sheets from that dead hook and handed them to the boys. I thought that, if there was anything that ought not to be published, the defendant would be back in time to look it over; but he did not come back until too late to do anything. I made no statement to him that I turned the copy over."

On March 14, 1918, the defendant hearing that a warrant had been issued for Roberts, wrote the latter that he (Elmer) had written the article complained of, and that he was going down to St. Louis and tell the district attorney that Roberts had no knowledge or information concerning its publication, and take the whole responsibility of it upon nimself. There is no evidence in the record which contradicts the testimony of the defendant and the stenographer in any material way as to the manner in which the article came to be published, except the evidence of Mr. White, to the effect that the defendant admitted that he had published the article. This admission, taken in connection with the defendant's interest in relieving Roberts of any responsibility, and the testimony, uncontradicted, as to how the article came to be published, we do not think is sufficient to sustain the charge that the defendant intentionally caused the article to be published. As the defendant was not the editor, owner, or publisher of the paper, we cannot say there was substantial evidence to authorize the jury to find that he intentionally caused the article to be published.

[2] During the closing argument to the jury on behalf of the United States, the Assistant Attorney General used the following language:

"I want to say this to you: If I had a boy, and a man should come to him and say: 'My boy, you are shackled; you are manacled; you are being sent to certain slaughter. You are not a free American at all. You are the slave of a system that is vicious and wrong.' If a man said that to my boy in my presence, if I could kill that man with my naked hands, I would do it."

Counsel for the defendant objected to the use of such language, and in answer to the objection the court said to the Assistant Attorney General:

"I think that is an improper statement. The question involved here is not what any individual would do, but whether there was an obstruction of the recruiting and enlistment service—"

We do not think that the remarks of the trial court were sufficient to remove the effect upon the jury of the language used. The jury should have been instructed to disregard the language complained of and to give it no effect in arriving at their verdict. The trial was had on November 6 and 7, 1918. In Hall v. United States, 256 Fed. 748, —— C. C. A. ——, the Court of Appeals of the Fourth Circuit, in reversing a judgment for improper remarks of counsel, said:

"In a time like this, when patriotism is at a high pitch, and many people have to a certain extent lost their mental poise, courts and jurors should be extremely cautious, when required to pass upon the rights of an individual charged with an offense affecting the welfare of the government."

This court, in the case of August v. United States, 257 Fed. 388, —— C. C. A. ——, reversed a judgment for improper remarks of counsel for the United States. The defendant in the case at bar was not being tried for an offense punishable with death, and the remarks complained of, coming from a high official of the United States, would naturally inflame the passions and prejudices of the jury to such an extent as to prevent a fair trial.

Upon the whole record we are of the opinion that the judgment below should be reversed; and it is so ordered.