PLUMB *v.* PENN MUTUAL LIFE INSURANCE CO.

1. LIFE INSURANCE—CONDITIONS—"GOOD HEALTH" OF APPLICANT.
The term "good health," as used in a policy of life insurance, or in an application therefor, means a state of health free from any disease or ailment that affects the general soundness and healthfulness of the system seriously, and not a mere temporary indisposition, which does not tend to weaken or undermine the constitution of the insured.

2. SAME.
In an action upon a life-insurance policy conditioned that the insured should be in good health at the time of the delivery of the policy, it appeared that the policy was delivered to the insured on Tuesday; that she had done a hard day's work on the Saturday preceding; that she took some medicine that night, and on Sunday was not feeling well; that on Monday, Tuesday, and Wednesday she had some disturbance of the bowels, but was about the house, doing her work, and resting occasionally; that inflammation of the bowels set in on Thursday; that on Saturday she became seriously ill, and died the following Tuesday. *Held,* that the question whether the insured was in good health at the time of the delivery of the policy was properly left to the jury.

3. SAME—IMMATERIAL VARIANCE.
The insured stated in her application for insurance that she had been attended by a physician for *la grippe* three years previously, when in fact she had been so attended two years and nine months before making such application. *Held,* that there was not such a variance as would invalidate the policy for breach of warranty.

4. SAME—ATTENDANCE OF PHYSICIAN.
To have been "attended by a physician," or to have "consulted one professionally," within those terms as used in an application for life insurance, there must have been an attendance or consultation with reference to some disease or ailment of a serious character, affecting the person's sound bodily health, and not in relation to a mere temporary indisposition, or an ailment trivial in its nature, such as all persons are liable to who are nevertheless considered to be in sound health generally.

5. SAME—EVIDENCE.

As tending to show that the insured had been treated by a physician for a certain disease, the defendant offered in evidence a prescription claimed to have been prepared for her by such physician; but the druggist who filled the prescription was unable to testify that it was brought to him by the insured. *Held,* that it was properly rejected.

6. SAME—MISTAKE OF AGENT OF INSURER.

The fact that the agent of the defendant, in filling out the application, incorrectly stated the maiden name of the insured, did not affect the validity of the policy.

7. SAME—PROOFS OF DEATH—EVIDENCE.

After proofs of death had been furnished by the plaintiff, the defendant, without plaintiff's authority or knowledge, procured certain affidavits concerning matters that occurred before the death of the insured, and produced them upon the trial, with the request that they be introduced in connection with the proofs of death. *Held,* that the court did not err in refusing to compel plaintiff to introduce such affidavits in evidence.

Error to Wayne; Frazer, J. Submitted December 5, 1895. Decided December 30, 1895.

*Assumpsit* by Ida G. Plumb against the Penn Mutual Life Insurance Company on a life-insurance policy. From a judgment for plaintiff, defendant brings error. Affirmed.

*Fraser & Gates*, for appellant:

The evidence showed that the insured was not in good health at the time of the delivery of the policy, and the policy, therefore, never became a binding obligation. May, Ins. § 190; Cooke, Life Ins. p. 45; *Insurance Co. v. Gilbert*, 27 Mich. 429; *Canning v. Farquhar*, 16 Q. B. Div. 727; *Whitley v. Insurance Co.*, 71 N. C. 480; *Ormond v. Life Ass'n*, 96 N. C. 158; *Insurance Co. v. Kennedy*, 6 Bush, 450; *McClave v. Life Ass'n*, 55 N. J. Law, 187; *Insurance Co. v. Ewing*, 92 U. S. 377.

The insured having professionally consulted a physician within the period of three years, her warranty in that respect was broken, and plaintiff should not have been

permitted to recover; it was immaterial whether the ailment for which she was treated was temporary or permanent, slight or serious. *Insurance Co.* v. *McTague,* 49 N. J. Law, 587; *Cobb* v. *Benefit Ass'n,* 153 Mass. 176; *Brady* v. *Insurance Ass'n,* 60 Fed. 727.

*Alfred Lucking,* for appellee:

To support the judgment, counsel relied upon the authorities that are cited in the opinion herein.

LONG, J. Plaintiff brings this suit upon an insurance policy issued by the defendant company upon the life of her mother, Samantha L. Plumb, of Detroit, in the sum of $1,000. Upon the trial, plaintiff had verdict and judgment. The application was made in writing, and taken by a Mr. Hodge, who had arranged with the defendant company to procure insurance for it. The application was written December 16, 1893, but the medical examination was not had until January 16, 1894, and the policy was dated January 19th. The receipt for the first premium was countersigned by the Michigan State agent of the defendant on January 22d, and left in the office of the company at Detroit until January 30th, when it was taken by Mr. Hodge, and handed to the insured. The insured died February 6th following.

To the declaration filed the defendant pleaded the general issue, and gave notice under its plea that it would show upon the trial that in and by said application the insured expressly warranted and agreed that she was then in good health, and ordinarily enjoyed good health, and that in the statements and answers in said application for insurance no circumstance or information had been withheld touching her past or present state of health and habits of life with which said defendant ought to be made acquainted, and that said statements and answers in said application, as well as those made to defendant's medical examiner, should constitute the application, and be the basis of said policy; and that said insured in said application falsely and fraudulently stated

and answered in substance, as follows: That she was in good health; that it had been three years since she had been attended by a physician, or had professionally consulted one; that the disease for which such physician was so consulted was *la grippe;* that such physician was Dr. Mills, and his residence Port Huron, Mich.; that said Dr. Mills was her said medical adviser and family physician; that she had not had any illness or disease other than as stated in said application; and that all the statements contained in said application were warranted to be true, and that the same were offered to the defendant as a consideration for said contract of insurance. Defendant further gave notice that it would likewise insist that, at the time of the making of said application, the insured was not in good health; that on divers days and times within such three years, and from June, 1890, to October, 1893, she had been attended by and had professionally consulted divers physicians, especially O. M. Stephenson, of Port Huron, Mich., and that the disease for which said consultation and attendance were had was not *la grippe,* but another and different disease; that all the above-mentioned statements and answers were false and fraudulent, and that the defendant, being deceived and misled thereby, made and executed said policy of insurance. It was further claimed by the notice that the defendant would prove upon the trial that its liability, by the express terms and provisions of the policy, was upon the following among other conditions, to wit: That said insured should be in good health at the time of the delivery to her of said policy; but that before and at the time of the delivery thereof, to wit, January 30, 1894, the insured was not in good health, and that, on the contrary thereof, she was in bad health, and was ill and sick with divers diseases, to wit, with disease whereof she did afterwards die, viz., peritonitis; and that said insured did not disclose the same to the defendant, but fraudulently and wrongfully obtained possession of said policy contrary to the terms and conditions thereof.

The policy provided that the $1,000 should be paid upon the following conditions, to wit: " * * * The insured to be in good health at the time of the delivery to her of this policy." On the trial the plaintiff gave evidence tending to show that the insured was in good health on January 30th, being the date on which the policy was actually delivered to the insured. The defendant gave testimony tending to show that the insured was not in good health on that date; and the court, in its charge to the jury, left that question to them as follows:

"If Mrs. Plumb was not seriously ill on the 30th of January, 1894, then there is nothing in this claim or defense on the part of the defendant. The question as to whether this woman was seriously ill at the time when this policy was delivered to her is a matter for you to determine under the evidence. You will remember what the evidence was as to what was the cause of her sickness, what was the character of her sickness, and what condition she was in at the time when this policy was delivered; and I charge you that this policy was delivered, under the law of this case, at the time it was actually transferred to her, which was on the 30th day of January, 1894; not when the policy was made out, not when it was received at the office here in Detroit, but when it was delivered to her by the agent or solicitor of the defendant in this case, Mr. Hodge. If you shall find under the evidence in this case that, at that time, Samantha L. Plumb was afflicted with a serious illness that affected her sound bodily health, then that policy was delivered against its terms and conditions, and the delivery of that policy would be void; but if you shall find that she was not afflicted with a serious illness affecting her bodily health, then she was in such a condition that the delivery of this policy would be authorized under its terms, and would, therefore, be binding upon the defendant."

It appeared from the testimony introduced by the plaintiff that the insured did a hard day's work on Saturday, January 27th. She took some medicine that night, and on Sunday was not feeling well. She had some disturbance of the bowels Monday, Tuesday, and Wednesday, but was about the house, doing her work, and resting oc-

casionally.  On Thursday inflammation of the bowels set in, and her case became serious on Saturday.  She died the next Tuesday.  Dr. Judson, her attending physician, testified that on Tuesday—the day the policy was delivered to her—she had some pain in the bowels, but it was nothing serious; that he first regarded her as seriously sick on the Saturday following.  Mr. Hodge, the defendant's agent, who was a boarder in the house, testified that when he gave her the policy she was slightly indisposed, but that there was nothing but what would be commonly called good health, and that she was around the house as usual.  The plaintiff testified that her mother was a little indisposed on the 30th, but was up and around the house, and got breakfast and dinner as usual, and that it was not until the Saturday following that she considered her seriously ill; and the husband of the deceased testified that she was not seriously ill until Saturday.

In *Brown* v. *Insurance Co.*, 65 Mich. 306, the court instructed the jury that the "sound health evidently meant in the application.is a state of health free from any disease or ailment that affects the general soundness and healthfulness of the system seriously; not a mere temporary indisposition, which does not tend to weaken or undermine the constitution of the assured."  That charge was approved by this court.  See, also, upon this question:  *Pudritzky* v. *Supreme Lodge*, 76 Mich. 428; *Hann* v. *National Union*, 97 Mich. 513.  In the present case the court'properly left the question to the jury whether the insured was in good health at the time of the delivery to her of the policy.

In regard to the claimed untrue statements contained in the application, it appears that the medical examination was made by Dr. Lyster, of Detroit, who wrote down the applicant's answers to the questions.  The printed questions in the medical examination, and her answers, were as follows:

"(1) How long since you were attended by a physician, or professionally consulted one?

"*A.*  Three years.
" (2)  For what disease?
"*A.  La grippe.*
" (3)  Give the name and residence of such physician?
"*A.*  Dr. Mills, of Port Huron."

In another portion of the examination she was asked whether she had ever had certain diseases therein named, and answered, " None, except enteric fever, when eighteen years of age;" and Dr. Lyster adds to his certificate of examination the following: "She is apparently of a very sound physique; has had *psoriasis palmaris* since menses disappeared in September, 1893.  No enlarged glands, or any indications of syphilis, which denies."

To show the falsity of these statements, defendant called several witnesses.  One Donald McKay testified that he was bath-house attendant at Port Huron, and knew Mrs. Plumb in her lifetime; that he treated her by the Swedish treatment a dozen times in the spring and summer of 1892; that she was troubled with partial paralysis of the right side; and that he observed when treating her, as to her having been affected with syphilis.  He then stated: " My observations were that she had some sores on the hand; they were syphilitic sores,—secondary syphilis." On his cross-examination he testified that he was not a physician, but that he was in business with Dr. Stephenson.  He further testified that he gave massage treatment to Mrs. Plumb.  Defendant then introduced in evidence the deposition of Dr. Stephenson, taken on behalf of defendant.  He resides at Elyria, Ohio, but formerly practiced medicine in Port Huron.  He states that while there he was first called upon by Mrs. Plumb December 1, 1889; that he treated her continuously from that time until October, 1893, in Port Huron and Detroit; that sometimes she would come to his office three or four times each week; that she was much run down physically, and that he treated her for the disease known as syphilis.  On his cross-examination he was asked whether a Mrs. Becker

was not present when Mrs. Plumb consulted him, and testified that she was not, and that he did not state to Mrs. Plumb, in the presence of Mrs. Becker, that Mrs. Plumb's trouble came from coloring matter getting into her hands when washing a carpet.

The plaintiff then called witnesses who testified upon the subject of Mrs. Plumb's health during the three years just previous to her death. The daughter testified that her mother had salt-rheum the last three or four years of her life, which affected her in the palms of her hands, and nowhere else. She says: "I knew all about it. We occupied the same sleeping apartment a good portion of the time, and I know there was nothing on any part of her body. I have seen all parts of her body during the last four or five years before her death." She further testified that she remembered her mother's being sick with *la grippe;* that it was about three years before her death, and that Dr. Mills attended her; that she knew her mother was taking some blood medicine, given her by Dr. Stephenson, as he had a reputation for treating skin diseases; that her mother's hands would crack and bleed; and that Dr. Mills also prescribed for her hands. Dr. Mills testified that he was the family physician, and saw a good deal of the deceased; that he knew of her having some sores or indications of trouble with her hands, and that he called it salt-rheum; that he never saw anything that indicated syphilis in the least. Mrs. Becker testified that she went with the deceased to Dr. Stephenson's office three or four times, and was in the room all the time they were there; that she heard Dr. Stephenson say, in reference to the sores upon Mrs. Plumb's hands, that there was no use being alarmed about them; it was a simple disease,—nothing but salt-rheum; and that, when he asked her what she had done to irritate them, she told him she had washed a carpet, and they stayed colored three or four days, and he said that was the first cause of it. The witness further stated

that she was at Mrs. Plumb's house for about two weeks, and when Mr. Plumb was away she occupied the same room with Mrs. Plumb, and that there was no spot or blemish upon her body, except on the hands. A Mrs. Parish testified that she was attendant at the bath house at Port Huron, and knew the witness McKay; that he never treated Mrs. Plumb with the massage treatment. She further said: "I saw her from the time she came until she went away. I assisted her on every occasion but twice, when my eyes were bad with gas, and she took her own baths. I rubbed every portion of her body. I never saw a spot on her body in any way, shape, or manner, except a little spot in her hands. She first took baths in 1891, a few in 1892, and two in 1893. I had to attend the lady bathers until they were dressed, and ready to go out." The husband of Mrs. Plumb also testified that there was no indication of any eruption on any portion of her body; that he knew of her having no other skin disease than that in her hands, which the doctor pronounced salt-rheum. The plaintiff also gave testimony by several witnesses from Port Huron that they knew Dr. Stephenson, had known him for years, and that his reputation for truth and veracity in that neighborhood was bad.

Speaking of these statements in the application which defendant claimed to have been false, the court stated to the jury:

"There were no misrepresentations as to the disease *la grippe*, which Mrs. Plumb stated she was troubled with; and two years and nine months, when she stated three years, is not such a substantial variation from the time as would make this statement a breach of the warranty, and void this policy."

In this, we think, the court was not in error. Dr. Mills had treated her for *la grippe* two years and nine months before, and the fact that she stated three months short of the time she was actually treated by him was not a material variation.

Upon the subject of the disease with which it was claimed Mrs. Plumb was afflicted, and for which she was treated by Dr. Stephenson, the court charged the jury:

"If you shall find that, within the three years, she was attended by or consulted with another physician for any serious disorder other than the consultation with Dr. Mills, which I have charged you already about, that would be a breach of the conditions of this application, and a breach of the warranty, and would make this policy void, and the plaintiff in this case could not recover; but I charge it to be the law, as laid down by the Supreme Court of this State in the case of *Brown* v. *Insurance Co.* [65 Mich. 306], that a mere calling at a doctor's office for medicine to relieve a mere temporary indisposition, not serious in its nature, or his calling at the applicant's home for the same purpose, could not be considered an attendance within the meaning of this question; but that such attendance must be for some disease or ailment of importance, and not for any indisposition for a day or so, trivial in its nature, such as all persons are liable to, and yet are considered to be in sound health generally.   *   *   *   It is the law of this State that she must have had a physician in attendance upon her, or have been in consultation with a physician, concerning some matter which affected her sound bodily health; and I charge you that 'sound health,' as used in this application, means a state of health free from any disease or ailment that affects the general soundness or healthfulness of the system seriously, and not a mere indisposition, that does not tend to weaken or undermine the constitution of the insured.   *   *   *   If you find that the disease for which she consulted any physician during all these three years, except, of course, *la grippe*, of which I charged you before, was of a serious character, affecting her bodily health, that would be a breach of the warranty, and the plaintiff could not recover.   It is for you to say from the evidence in this case whether this trouble with her hands was of such a serious character that it affected her general bodily health.   If you shall find that this was a symptom of or the consequence of her being afflicted at any time during her life with the disease known as syphilis, I charge you that that would be a breach of the warranty; that syphilis is of such a serious character, and known to be of such a serious character, that it does affect the soundness or bodily

health of the applicant, and that if any person who has had syphilis at the time of the application, constitutionally or otherwise, represents herself to be of sound bodily health, or, in answer to the question whether she has had syphilis, in this case, denies having had it, and you shall find that to be the fact, it will be a breach of the warranty in this case, and she could not recover."

This charge correctly stated the law. *Brown* v. *Insurance Co.*, 65 Mich. 306; *Hann* v. *National Union*, 97 Mich. 513; *Pudritzky* v. *Supreme Lodge*, 76 Mich. 428; Bliss, Ins. §§ 105, 109.

It is claimed that the court was in error in not permitting the defendant to introduce in evidence certain prescriptions which it is claimed Dr. Stephenson prepared for Mrs. Plumb. They appeared to be in Dr. Stephenson's handwriting, but the druggist who was called was unable to state that Mrs. Plumb brought them to his drug store to be filled; and we think the court properly rejected them.

Some claim is made that the maiden name of Mrs. Plumb was not correctly stated in the application. The agent of the defendant company filled out the application himself, and incorrectly stated her maiden name. Fearing the error might lead to contention, the policy was handed back to the agent for the purpose of correction, and was not returned until after the death of Mrs. Plumb, when it was produced upon the trial by the defendant. This mistake would not affect the rights of the plaintiff to recover. *Temmink* v. *Insurance Co.*, 72 Mich. 388. The fault, if any, in giving the wrong name, was with the agent of the defendant in writing the application, and the company could not take advantage of it. *McGraw* v. *Insurance Co.*, 54 Mich. 145; *Ahlberg* v. *Insurance Co.*, 94 Mich. 259.

After the death of Mrs. Plumb, proofs of death were furnished by the plaintiff, and thereafter the company procured certain affidavits concerning matters that occurred before her death. The defendant produced these affidavits on the trial, and asked that they be introduced in connec-

tion with the proofs of death.   The court held that, as they were not furnished by the plaintiff, nor by her authority, and as she knew nothing of them, and they did not relate to the death of Mrs. Plumb, plaintiff would not be required to introduce them in evidence.   We think the court was not in error in refusing to receive the affidavits; but, even if the court had been in error in not receiving them, they were used upon the trial, and witnesses were cross-examined fully in regard to them.   No proofs could be required except those called for by the policy.   Bliss, Ins. §§ 250, 251.

We have carefully examined the record upon all the points made by defendant's counsel, and are unable to find any error committed upon the trial.

The judgment will be affirmed.

McGRATH, C. J., GRANT and HOOKER, JJ., concurred. MONTGOMERY, J., did not sit.