NEW YORK LIFE INS. CO. v. WERTHEIMER et al.

(District Court, N. D. Ohio, E. D. December 10, 1920.)

No. 501.

1. **Insurance ☞136(4)—Life policy not effective where insured was not in "good health" when delivered.**

A life insurance company *held* entitled to cancellation of a policy is-, sued on an application, made a part of the contract, which contained a clause providing that the insurance should not take effect unless the policy was delivered to and received by the insured during his lifetime and good health, where at the time of delivery of the policy insured was afflicted with a serious and mortal disease, which fact was not known to the company; the term "good health," so used, meaning a state of health free from any disease or ailment that affects seriously the general soundness and healthfulness of the system, and not merely such temporary disturbances or disorders as yield readily to treatment and do not tend to weaken or undermine the constitution.

[Ed. Note:—For other definitions, see Words and Phrases, First, and Second Series, Good Health.]

2. **Insurance ☞292—Policies invalidated by false and fraudulent statements as to medical attendance.**

Statements made by an insured in applications, in answer to questions that he had not consulted or been treated by any physician within the past five years for any ailment or disease, when in fact he had consulted three different physicians within the past two years, two of them a very few days previously, in regard to a serious ailment diagnosed by all as paresis or a paretic condition, and which caused his death within little more than a year afterward, which statements were not known to be ·false by the insurer or its agent, but were relied on, *held* to invalidate the policies under their terms and also under Gen. Code Ohio, § 9391, providing that no answer by an applicant for insurance shall bar recovery "unless it be clearly proved that such answer is willfully false, was fraudulently made, that it is material and induced the company to issue the policy, * * * also that the agent or company had no knowledge of the falsity or fraud of the answer."

3. **Insurance ☞256(2)—Intent to deceive implied from material false statement in application.**

A positive statement of fact, falsely made in an application for insurance, and known to be false by the maker, with respect to a material matter, will, nothing else appearing, be deemed to have been made willfully and with intent to deceive.

In Equity. Suit by the New York Life Insurance Company against Benjamin Wertheimer and others. Decree for complainant.

Garfield, MacGregor & Baldwin, of Cleveland, Ohio, for plaintiff.

Max P. Goodman, of Cleveland, Ohio, for defendants.

WESTENHAVER, District Judge. This action is brought to compel the surrender and cancellation of two insurance policies issued by plaintiff upon the life of Benjamin Wertheimer, one for $5,000, dated February 12, 1918, for the benefit of his wife, Hattie S. Wertheimer, and the other for $3,500, dated July 31, 1918, for the benefit of his said wife and a son M. Albert Wertheimer.. Both policies contain clauses making them incontestable upon any ground after two years

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

from the date of issue. Plaintiff alleges that in August, 1919, it discovered for the first time that the insured was not, when the policies were issued and delivered, in good health, and also that the insured had made material representations which were willfully false, and on which it relied, in order to procure the issue of the policies, and that upon discovery thereof the plaintiff on August 30, 1919, tendered back all the insurance premiums received, with legal interest, and had demanded the surrender of the policies, which demand had been refused. The money thus tendered was paid into court on the filing of the petition herein.

Plaintiff's right to relief rests on two grounds. One is that these insurance contracts contained a condition that they should not take effect unless the insured was in good health at the time the policies were delivered. The other is that the insured, in his written applications, which are made a part of the policies, made material statements and representations which were willfully false and fraudulently made, and were relied upon. The law relating to these grounds of relief is different and will therefore be considered separately.

[1] 1. The applications do contain a clause which provides that the insurance applied for shall not take effect unless the first premium is paid and the policy is delivered to and received by the insured during his lifetime and good health. The applications are made a part of the policies, and have the same effect as if written in the policies. See Hubbard v. Mutual Reserve Fund (1 C. C. A.) 100 Fed. 719, 40 C. C. A. 665; First National Bank v. Hartford Ins. Co., 95 U. S. 673, 675, 24 L. Ed. 563. The effect of these provisions is to make it a condition that the policies shall not take effect and become valid and binding unless the insured was in fact in good health at the time the policies were delivered. In this aspect, the insurer's obligation is not made to depend upon willful fraud or misrepresentation, but upon the fact as to whether or not the insured's health was good or otherwise. The inquiry then becomes an inquiry as to that fact, and does not depend upon the insured's knowledge or belief. It was so held in Metropolitan Life Ins. Co. v. Howle, 62 Ohio St. 204, 56 N. E. 908, and Metropolitan Life Ins. Co. v. Howle, 68 Ohio St. 614, 68 N. E. 4. Such, also, is the general, if not the uniform, rule of decision. See Barker v. Metropolitan Life Ins. Co., 188 Mass. 542, 74 N. E. 945; note 17 L. R. A. (N. S.) 1145, 1148. Nothing in conflict therewith is found in Mutual Life Ins. Co. of New York v. Long, Ohio Law Reporter, July 26, 1920, cited and relied on by defendants; but, on the contrary, the law as thus declared is fully recognized, and the only inquiry was whether or not the Court of Appeals would set aside a verdict of a jury because it was said to be against the manifest weight of the testimony. The provisions of section 9391, G. C. of Ohio, have no application to a condition of this nature embodied in an insurance policy. See authorities last cited.

The expression "good health," or "sound health," thus used in life insurance policies, it is uniformly held, means a state of health free from any disease or ailment that affects seriously the general soundness and healthfulness of the system, and not merely such temporary dis-

turbances or disorders which yield readily to treatment and do not tend to weaken or undermine the constitution. See Metropolitan Life Ins. Co. v. Howle, 62 Ohio St. 204, 56 N. E. 908; Standard Life & Accident Ins. Co. v. Sale (6 C. C. A.) 121 Fed. 664, 57 C. C. A. 418, 61 L. R. A. 337; Mutual Life Ins. Co. of New York v. Hurni Packing Co. (8 C. C. A.) 260 Fed. 641, 171 C. C. A. 405; Brown v. Insurance Co., 65 Mich. 306, 32 N. W. 610, 8 Am. St. Rep. 894; Plumb v. Penn Mutual Life Ins. Co., 108 Mich. 94, 65 N. W. 611.

That the insured was not, at the time these applications were made and the policies issued and delivered, in good health as thus defined, but on the contrary, was then afflicted with a serious and mortal disease, is clearly proved by the evidence. He was examined and treated twice by Dr. Fisher in May, 1917, by Drs. Grosh and Miller in July, 1918, and by Dr. Drysdale in the latter part of August, 1918, and thereafter at intervals until his death on August 19, 1920. These witnesses agree that he was afflicted with paresis, or an illness of a paretic nature. Dr. Drysdale's testimony differs only from the others in that he is unwilling to ascribe the cause of his ailment to syphilis, as do the other three. The insured's condition became acute, resulting in dementia, about the middle of August, 1918, and continued, with brief remissions, to grow worse until August 16, 1919, when a committee was appointed for him, and thereafter until his death resulted. The witnesses also agree that this ailment, although the victim himself may not have been aware of it until it reached an acute stage, or shortly prior thereto, was nevertheless present, and had been present for years, probably not less than eight years. Bearing in mind the rule of law already stated, that the insurer's obligation does not depend upon the insured's knowledge of his state of health or any misrepresentation with respect thereto, but upon the fact itself as to whether the insured was in good or sound health, the extent of the insured's knowledge of his state of health becomes immaterial. It will, however, be adverted to in discussing the other ground upon which relief is sought.

[2] 2. The insurance applications contain questions and answers by the insured respecting past illnesses and the state of his health. Among these are the following:

"Have you ever had rheumatism, gout, or syphilis? Have you ever consulted a physician for any ailment or disease not included in your above answers? What physician or physicians, if any, not named above, have you consulted or been treated by within the last five years, and for what illness or ailment?"

To each of these questions, as well as to all others relating to the insured's present health or past ailments, he gave an unqualifiedly negative answer. The applications also contain a clause reciting that each of the answers is written by the applicant and that they are full, complete, and true; that the statements, representations, and answers are made to obtain insurance, and that he agrees that they are each material to the risk; and that the company, believing them to be true, will rely and act upon them.

Plaintiff's right to relief upon this ground is based upon fraud perpetrated by the insured in obtaining these policies. The law of Ohio controls and is set forth in section 9391, G. C. of Ohio. The section

provides that no answer by an applicant for insurance shall bar recovery—

"unless it be clearly proved that such answer is willfully false, was fraudulently made, that it is material, and induced the company to issue the policy, and that but for such answer the policy would not have been issued, and also that the agent or company had no knowledge of the falsity or fraud of such answer."

This section may be taken as declaring the general rules of law relating to actionable fraud or deceit at common law. Relief may not be granted unless the misrepresentations were willfully made with respect to a material matter and were relied upon and induced the making of the contract. It cannot be said that a willfully false misrepresentation was relied upon, if its falsity is known to the other party or his agent. The burden of proof is always upon the party asserting the fraud, and one will not be found guilty of perpetrating fraud unless it be clearly proved.

No useful purpose will be served by reviewing and analyzing the evidence in detail. It will be sufficient to state what I find therefrom to be the outstanding and controlling facts. All criticisms made of this testimony by the defendant have been duly considered, and my findings are made only after duly weighing the entire testimony.

The insured consulted Dr. Fisher twice in May, 1917. At the first consultation, Dr. Fisher made a careful examination of the insured and reached the conclusion that he was suffering from paresis, and so advised him, and further told him that syphilis was a common cause of his condition, and inquired if he had ever had it. The insured emphatically asserted that he had not. At the second consultation, held about a week later, a treatment was given by an injection of salvarsin, the usual remedy for syphilis or a syphilitic condition. The insured did not return for any further consultations or treatments. Dr. Grosh saw the insured about July 15, 1918, and then made a careful examination of him. This doctor also reached the conclusion, as a result of such examination and consideration of the symptoms as stated by the insured, that the latter was suffering from paresis and believed it to have been induced by syphilis. He made no specific tests to determine whether syphilis was the cause or not, but, like Dr. Fisher, relied upon the general medical belief and experience that syphilis is the cause of paresis, or a paretic condition, in 99 per cent. of cases. Intending to leave the city, Dr. Grosh referred the insured to Dr. Miller, who saw him for the first time about July 17, again on or about July 29, and again still later at his home. This doctor also was of the opinion that the insured was suffering from paresis, and that it was caused by syphilis, but made no test to verify this opinion. He prescribed only palliatives, such as bromide. Neither Dr. Grosh nor Dr. Miller informed the insured of the cause of his illness.

Dr. Drysdale first saw the insured in the latter part of August, 1918, after his illness had become acute and dementia had developed. He also says the insured's illness was paresis, or of a paretic nature; but, basing his opinion upon a negative Wasserman test of the insured's blood, which was reported to him as having been made in Toledo,

a like test of the insured's wife, the state of health of the insured's son, and the subsequent course of the illness under his observation, expresses the opinion that syphilis was not the inducing cause of the paresis, or paretic symptoms, detected and identified by himself and the other physicians. Such differences as exist in the testimony of these several physicians relates, not to the insured's state of health, nor to the probable duration of the ailment, but to the cause of it. They agree that his illness was paresis, or of a paretic nature, and that it had been present in the insured's system long prior to the making of the first application.

Before relief can be granted on this ground, it must, as has already been said, be clearly proved that the insured made the representations willfully and fraudulently. If he did not know or did not believe his health to be impaired, or that he had had syphilis, it would not be a willfully false representation to give a negative answer to that question, even though he in fact had paresis or syphilis. If the case turned on the negative answer to that question alone, the plaintiff would not have clearly sustained the burden of proof, at least as to the first policy. It is at least equally probable that the insured, notwithstanding his consultations with Dr. Fisher and the information then received, or the treatment to which he then submitted, may have believed in good faith that the doctor was wrong and that he was not thus afflicted.

However, the insured answers positively that he had not consulted any physician or physicians within five years. This positive statement is also contained in the last application, dated July 31, 1918; whereas he had consulted Dr. Miller only two days prior thereto, and both Drs. Miller and Grosh about the middle of the month, under circumstances which repel any inference that he did not then realize the serious impairment of his general health. His answers in the last application reflect upon the good faith of similar answers in the earlier application. He had consulted Dr. Fisher twice prior thereto, and had received information and had been given treatment which indicated a condition of health so seriously impaired that it could not have failed to impress itself upon his memory. Coupled therewith may be noted the fact that between February 12, 1918, when the first policy was applied for, and July 31, 1918, when the second policy was applied for, he had procured three other policies of insurance upon his life.

[3] Upon consideration of all the evidence, it must be found that his answer that he had not consulted or been treated by any physician within the preceding five years was false, and was made knowingly and willfully and with intent to deceive. A positive statement of fact, falsely made, with respect to a material matter, will, nothing else appearing, be deemed to have been made willfully and with intent to deceive. It is only when the consultation and treatment relates to such temporary disorders or ailments as do not conflict with the definition of good or sound health as given above that negative answers to questions of this character can be disregarded as immaterial. See Mutual Life Ins. Co. of New York v. Hurni Packing Co. (8 C. C. A.) 260 Fed. 641, 171 C. C. A. 405; Mutual Life Ins. Co. v. Hilton-Green, 241 U. S. 613, 622, 36 Sup. Ct. 676, 60 L. Ed. 1202; Plumb v. Penn

Mutual Life Ins. Co., 108 Mich. 94, 65 N. W. 611. If the answer is untrue, and the matter is material, and the maker of the statement necessarily knows that it was not true when he made it, the intention to deceive the insurer is necessarily implied as a consequence of such act. See Mutual Life Ins. Co. v. Hurni Packing Co., supra, 260 Fed. 646, 171 C. C. A. 405; Claflin v. Commonwealth Ins. Co., 110 U. S. 81, 3 Sup. Ct. 507, 28 L. Ed. 76.

The insured must have known that his consultation with these several physicians was with respect to matters seriously affecting his health, and not mere temporary ailments or disorders which readily yield to treatment. Nothing appears to indicate that the insurer or any authorized representative knew the truth respecting these previous consultations, but the contrary is made to appear, so far as it is possible to prove a negative. It follows that the insurer will be held to have relied upon positive representations thus made and was thereby induced to act. The conditions of section 9391, G. C. of Ohio, under which relief may be granted, are fully sustained by the evidence.

My conclusion is that plaintiff is entitled to relief upon both grounds. A decree will be entered in conformity herewith, requiring the policies to be surrendered and canceled, and directing the payment, after deducting costs, of the money deposited in court to the personal representative of the insured.