WOODLAND *v.* LIBERTY LIFE INSURANCE CO.

1. INSURANCE—LIFE INSURANCE—"GOOD HEALTH" DEFINED.
   The expression "good health," as used incident to insurance contracts, is comparative, and has a more or less flexible meaning and has been defined as a state of health free from any disease or ailment that affects the general soundness and healthfulness of the system seriously, not a mere temporary indisposition which does not tend to weaken or undermine the constitution of the assured.

2. SAME—ONE ILL WITH PNEUMONIA NOT IN GOOD HEALTH.
   Where, at the time an application for reinstatement of a life insurance policy was approved at the home office of insurer, insured was ill with pneumonia, which resulted in his death two days later, he was not in "good health," which was a prerequisite of reinstatement, within the meaning of the policy.

3. SAME—DIRECTED VERDICT.
   Where, in an action on a life insurance policy, it conclusively appeared that at the time the policy was reinstated insured was not in "good health," as required by the policy, but, on the contrary, was seriously ill and continued in that condition until his death two days later, a verdict in favor of insurer should have been directed.

Error to Wayne; Marschner (Adolph F.), J. Submitted January 4, 1928. (Docket No. 49.) Decided February 14, 1928.

Assumpsit by Nan Woodland against the Liberty Life Insurance Company on a policy of insurance. Judgment for plaintiff. Defendant brings error. Reversed, and judgment ordered entered for defendant.

*Roxborough, Taliaferro, Butler & Jones,* for appellant.

*Condon, Condon & Mosier,* for appellee.

[1]Good, 28 C. J. § 16; Life Insurance, 37 C. J. § 240; [2]Id., 27 C. J. § 240; [3]Id., 37 C. J. § 446; 40 A. L. R. 667; 14 R. C. L. 1069; 3 R. C. L. Supp. 336; 5 R. C. L. Supp. 795; 6 R. C. L. Supp. 854.

NORTH, J.   This suit was brought on a life insurance policy for $1,000 by which plaintiff's husband was the insured.   He died of lobar pneumonia April 6, 1924.   Under the plea of general issue the defendant gave notice it claimed as a special defense that the policy, which had lapsed, was not reinstated during the good health of the insured.   The case was tried by jury and a verdict rendered in favor of the plaintiff.

At the close of the proofs the defendant moved for a directed verdict in its favor.   The trial judge reserved his decision under the statute.   After verdict the defendant made a motion for judgment *non obstante veredicto*.   This was denied.   Each of these motions was based primarily upon defendant's contention that the undisputed testimony in the case established the fact that the insured was not in good health at the time the application for reinstatement was approved. This policy was issued on the 22d day of November, 1922.   The premium was to be paid in equal quarterly installments of $8.17 each.   The quarterly premium which fell due February 22, 1924, was not paid, and after 30 days the policy lapsed.   On the 1st day of April, 1924, an application for reinstatement was made in behalf of the insured and incident to this the past-due quarterly premium of $8.17 was paid to the company's Detroit agent.   The application for reinstatement contained the following provision:

"Said policy shall not be renewed or go into effect until this certificate is approved by said company at its home office during my lifetime and continuance in good health."

This application for reinstatement was forwarded to the insurance company's office in Chicago, and the undisputed proofs show that it was approved there by the proper official some time after 2 o'clock on the afternoon of April 4, 1924.   As above indicated, the defendant's claim is that it appears from the undis-

puted facts the insured was not in good health at the time of the approval. The plaintiff asserts this question was properly left to the jury by the trial judge. This presents the controlling question for determination.

The defendant tendered repayment of the above-mentioned quarterly premium. There is no occasion for quoting the testimony in full, but in so far as it relates to the condition of the insured's health at the time of renewal or reinstatement of the policy, its purport can be ascertained from the following: The plaintiff testified:

"My husband took sick on Friday, April 4, 1924. He went to work in the forenoon about 6 o'clock, came home around 10 o'clock, and did not go back to work after that. He lived for a period of about two days, and died on Sunday, April 6, 1924, around 6 o'clock. The cause of his death was pneumonia. He came home around 10 o'clock (April 4th); he could not work. He was sick. * * * When my husband came home at 10 o'clock, on April 4th, I undressed him and called Dr. Johnson to see him. He was in bed, too sick to go to the doctor's home, so I called the doctor. The doctor examined him and took his temperature on April 4th, which was 107 degrees. He stayed in bed until his death. After the doctor diagnosed my husband's case, on April 4th, around noon, the doctor told me that my husband had lobar pneumonia, and that his fever was 107 degrees. He called three times on that day."

The same witness testified that when her husband left home on the morning of April 4th he was in good health; notwithstanding this, other testimony in the record discloses that he was compelled by illness to leave his work on April 3d and that he called that day at Dr. Johnson's office and secured a prescription for a cough or cold. In the proofs of death which plaintiff caused to be filed, Dr. Johnson, who was the family physician, made the statement that the insured showed

the first symptoms of his illness April 3, 1924. There is other testimony to the same effect; and all that can be found in the record which plaintiff's counsel claims in any way tends to change the purport of the foregoing is in the testimony of Dr. Johnson, who stated that the insured was not a very sick man on April 3d, and that when he first saw him on April 4th his temperature was around 104 degrees and that after making his diagnosis on that day he did not come to any definite conclusion, but that he had the deceased under observation for the purpose of determining what the trouble was.

The expression "good health," as used incident to insurance contracts, is comparative, and has a more or less flexible meaning. This court has said "sound health" is a state of health free from any disease or ailment that affects the general soundness and healthfulness of the system seriously, not a mere temporary indisposition which does not tend to weaken or undermine the constitution of the assured. *Brown* v. *Insurance Co.*, 65 Mich. 306 (8 Am. St. Rep. 894). And the foregoing seems to have been approved as a definition of "good health." *Hann* v. *National Union*, 97 Mich. 513 (37 Am. St. Rep. 365) ; *Plumb* v. *Insurance Co.*, 108 Mich. 94. If we test this case by the foregoing or any other fair and reasonable definition of the expression "good health," it is obvious that only one conclusion is possible from the proofs, which is that by noon of April 4, 1924, the insured was not in "good health," but on the contrary he was seriously ill and continued in that condition until his death two days later. The verdict of the jury cannot be sustained. The trial court should have granted the defendant's motion for judgment notwithstanding verdict.

Because of the error indicated, the judgment is reversed and the case remanded to the circuit court with

directions to set aside the judgment heretofore entered and in lieu thereof to enter judgment for defendant. The appellant will have costs in this court.

FELLOWS, WIEST, CLARK, MCDONALD, and SHARPE, JJ., concurred.    FLANNIGAN, C. J., did not sit.

The late Justice BIRD took no part in this decision.