## ADAMOS v. NEW YORK LIFE INS. CO.
### No. 7424.

District Court, W. D. Pennsylvania.
Feb. 24, 1937.

York Life Insurance Company, each in the sum of $5,000, on the life of Andy Adamos, has brought this suit. The Insurance Company is defending on the ground that the policies are null and void, by reason of false answers made by Andy Adamos in the course of his medical examination for this insurance. The case was tried before the court and a jury, with the result that at the conclusion of the testimony, the court gave the jury binding instructions to find a verdict in favor of the plaintiff for $1,184.36, the amount of the premiums paid for this insurance.

The plaintiff has moved for a new trial and assigned twenty reasons why that motion should be granted.

Reasons 1 to 7, inclusive, 19 and 20, relate to the affirmance of defendant's point for binding instructions to the jury, the refusal of plaintiff's request for instructions to the jury, and the failure of the court to submit the case to the jury on the issues arising out of alleged misrepresentations made by Adamos as to his medical history. Reasons 8 to 16, inclusive, and 18, relate to rulings on evidence. Reason 17 relates to refusal of plaintiff's motion to withdraw a juror and continue the case, on account of alleged improper remarks of defendant's counsel in the presence of the jury.

The correctness of our instruction to the jury all hinges on the question of whether or not, on the undisputed testimony properly admitted in evidence, we were justified in giving the binding instructions requested by defendant. If we were, then the requests of plaintiff to submit the case to the jury were properly refused. If we were right in so doing, then the alleged prejudicial remarks of defendant's counsel that the insured had deliberately and willfully committed a fraud could not have prejudiced the plaintiff.

We shall, therefore, confine our discussion to two questions: (1) Was there any error committed in the admission of evidence; (2) was there any error committed under the undisputed evidence admitted in giving binding instructions to the jury that the plaintiff was entitled to recover only the premiums paid for the insurance?

The first question of evidence relates to the admission in evidence of the application for insurance attached to the policies. Plaintiff complains that the photostatic copies attached to the policies do not

Leonard M. S. Morris and Sachs & Caplan, all of Pittsburgh, Pa., for plaintiff.

William H. Eckert and Smith, Buchanan, Scott & Ingersoll, all of Pittsburgh, Pa., for defendant.

SCHOONMAKER, District Judge.

George A. Adamos, beneficiary on four life insurance policies issued by the New

comply with the Pennsylvania law. We cannot so hold. In our view, the copy of the application is perfectly legible. We have had no trouble in reading it, and do not think the applicant would. This same type of copy attached to one of defendant's policies was passed upon by the Circuit Court of Appeals of this Circuit in Enelow v. New York Life Insurance Co., 83 F.2d 550, 105 A.L.R. 493, certiorari to Supreme Court denied in 298 U.S. 680, 56 S.Ct. 948, 80 L.Ed. 1401, and held to satisfy the Pennsylvania statute.

The second question of evidence relates to admission of the testimony of doctors. The plaintiff's objection is based on the Pennsylvania Act of 1907, P.L. 462, 28 P.S.Pa. § 328, which provides that a doctor may not testify in a civil case to any information acquired in attending a patient in a professional capacity, which would blacken the character of the patient, without the consent of the patient.

In the first place, Andy Adamos, in Part II of the application for the insurance, expressly waived all provisions of law which would forbid a physician to testify.

In the second place, there was nothing in the testimony of the doctors which would in any manner tend to blacken the character of Adamos.

In the third place, the Pennsylvania courts, in construing this act, held that it does not render incompetent the testimony of a physician in regard to facts which he learned by an examination of a patient. It excludes only communications from the patient to the physician, and then only when that communication was of facts which would tend to blacken the character of his patient. Skruch v. Metropolitan Life Insurance Co., 284 Pa. 299, 131 A. 186; In re Phillips' Estate, 295 Pa. 349, 145 A. 437. There was no information received by the physicians who testified in the instant case, which would tend to blacken the character of Andy Adamos in any way.

The third question of evidence relates to the competency of witnesses Kalkstone, O'Neil, and Welch to testify, since they were policyholders of the defendant, a mutual company.

The objection to their testimony is based on the Pennsylvania Act of 1887, P.L. 158, § 5(e), 28 P.S.Pa. § 322, which provides that where a party to a contract is dead, the surviving party shall not be a competent witness to any matters occurring before the death. This statute does not apply to the instant case. This suit is brought by George Adamos in his individual right. No right of the deceased, Andy Adamos, passed either by his act or by act of law to the plaintiff in this case. Hamill v. Supreme Council, 152 Pa. 537, 25 A. 645; Broadrick v. Broadrick, 25 Pa.Super. 225.

The fourth question of evidence relates to the exclusion of testimony of John D. Meyer as to alleged statements of Dr. Wiley, which would tend to contradict the doctor's evidence. We excluded this evidence in rebuttal, because no proper foundation was laid for it. It is a well-established principle of law that evidence of contradictory statements made by a witness out of court will not be admitted unless the witness has been previously given an opportunity on cross-examination to explain the alleged contradictory utterances. Marshall v. Carr, 275 Pa. 86, 89, 118 A. 621; Commonwealth v. Powell, 303 Pa. 104, 106, 154 A. 287.

This brings us to the second question in the case; i. e., were we right in holding that the policies were null and void by reason of fraud? After a careful review of the testimony, we conclude that we were. The four policies of insurance were all issued in pursuance of a written application signed by the insured on April 6, 1932. The insured died on July 6, 1932. According to the official death certificate, the cause of death was "carcinoma of sigmoid."

The written application for this insurance contained the following questions and answers thereto:

"7. A. Have you ever had any accident or injury or undergone any surgical operation? No.

"B. Have you ever been under observation or treatment in any hospital, asylum, or sanitarium? No."

"F. Have you gained or lost in weight in the last year? No."

"8. Have you ever consulted a physician or practitioner for or suffered from any ailment or disease of

"C. The Stomach or Intestines, Liver, Bladder, or Kidneys? No."

"10. Have you ever consulted a physician or practitioner for any ailment or disease not included in your above answers? No.

"11. What physicians or practitioners, if any, not named above, have you consulted or been examined or treated by within the past five years? None."

Each of the above answers is false. The truth is that Adamos met with an accident on March 14, 1926, and was so severely injured that from that time till he died on July 6, 1932, he collected workmen's compensation insurance from Jones & Laughlin Steel Corporation for total disability. The injuries received at that time were fractures of certain lumbar vertebrae, the base of his skull, both femurs, and the left tibia. On account of these injuries, he underwent a surgical operation by Dr. H. E. McGuire at a hospital where he was confined from March 14, 1926, to July 8, 1926.

In 1930 and 1931, Adamos was treated several times by Dr. Spanos for hypertrophy of the prostate gland.

In November and December, 1931, Adamos was treated by Dr. Belinky, who found the patient at home in bed, complaining of severe pains. This doctor diagnosed his ailment as sacroiliac arthritis, and prescribed a narcotic to alleviate the pain. Adamos told this doctor he had suffered pain in his back ever since he had fallen from a ladder some years before.

On December 11, and December 28, 1932, Dr. Owens was called to treat Adamos. This doctor found him in bed suffering pain in his lower abdomen. Dr. Owens thought this pain resulted from chronic appendicitis, and prescribed a sedative.

In February, 1932, Adamos again consulted Spanos. He told Dr. Spanos he had pain in the abdomen, and had lately consulted different doctors, each of them making a different finding as to his malady, i. e., chronic appendix and gallstones. Dr. Spanos then advised Adamos to go to St. Francis Hospital for a more complete examination. Accordingly, Adamos entered this hospital February 9, 1932, and remained there until February 12, 1932. Dr. D'Zmura and Dr. Davison both examined him, and both diagnosed his condition as cancer of the prostate gland and surrounding structures, such as the intestines. They found the cancer so far advanced as to be inoperable and incurable. Dr. D'Zmura at this time prescribed a narcotic to relieve pain. The prescription on its face shows that a narcotic was prescribed on account of an inoperable carcinoma.

On February 23, 1932, Dr. Owens was again called to treat Adamos. He found Adamos in bed, a very sick man. At that time the doctor found a mass in his lower left abdomen and diagnosed his condition as that of cancer.

This was the state of Adamos's medical history at the time he made his application for insurance on April 6, 1932. The facts above noted are undisputed.

The application for insurance which Adamos signed on April 6, 1932, was for $5,000 on the ordinary life plan. An additional policy of $5,000 was written on this application, and that fact the company noted on the face of the application under Subdivision No. 10, as follows:

"10. Additions or Amendments (For Home Office use only)

"(2) Additional policy $5000 written on the ordinary life plan."

This application also contained the following agreement as to the insurance:

"It is mutually agreed as follows: 1. That the insurance hereby applied for shall not take effect unless and until the policy is delivered to and received by the applicant and the first premium thereon paid in full during his lifetime, and then only if the applicant has not consulted or been treated by any physician since his medical examination; provided, however, that if the applicant at the time of making this application, pays the agent in cash the full amount of the first premium for the insurance applied for in Questions 2 and 3 and so declares in this application and receives from the agent a receipt therefor on the receipt form which is attached hereto, and if the Company, after medical examination and investigation, shall be satisfied that the applicant was, at the time of making this application, insurable and entitled under the Company's rule and standards to the insurance, on the plan and for the amount applied for in Questions 2 and 3, at the Company's published premium rate corresponding to the applicant's age, then said insurance shall take effect and be in force under and subject to the provisions of the policy applied for from and after the time this application is made, whether the policy be delivered to and received by the applicant or not. 2. That a receipt on the form attached as a coupon to this application form is the only receipt the agent is authorized to give for any payment made before the delivery of the policy. 3. That only the President, a Vice-president, a Second Vice-

166

President, a Secretary or the Treasurer of the Company can make, modify or discharge contracts, or waive any of the Company's rights or requirements; that notice to or knowledge of the soliciting agent or the Medical Examiner is not notice to or knowledge of the Company, and that neither one of them is authorized to accept risks or to pass upon insurability. 4. That by receiving or accepting said policy, any additions or amendments hereto which the Company may make and refer to in Question 10 above entitled 'Additions or Amendments' are hereby ratified."

Two of the policies in suit, i. e., Nos. 11,773,180 and 11,773,181, each for $5,000, are dated April 8, 1932, and were delivered on April 15, 1932. The premiums thereon were paid. The other two policies in suit, i. e., Nos. 11,780,717 and 11,780,718, are dated April 19, 1932, and were delivered to Adamos during the latter part of May, or the first part of June, 1932. The premiums thereon were paid.

The last two policies were issued on a supplemental application signed by Adamos, which states: "Supplemental to my application for insurance dated the 6th day of April, 1932, I hereby apply for $5,-000 additional insurance on the ordinary life plan to take effect April 8th, 1932, and I reiterate and confirm all the agreements, statements, representations and answers contained in my said original application, and agree that said original application shall form a part of said additional insurance contract. I further warrant and declare that no change has occurred in my health or insurability since the date of my said original application." Adamos signed these supplemental applications the date the policies were delivered, although the date on these papers is April 19, 1932.

After making the original application for insurance on April 6, 1932, Adamos again consulted a doctor and went to a hospital. April 18, 1932, Dr. Hadley was called to the home of Adamos, found him in bed suffering marked pain, and diagnosed the condition as cancer, prescribing a narcotic for relief of pain. He then sent Adamos to the West Penn Hospital, where Adamos was from April 21 to April 29, 1932. Three doctors, namely, Drs. Schildecker, Ritterer, and Langer, examined him, and diagnosed his condition as one of cancer, far advanced and inoperable. Dr. Langer administered deep X-ray and therapeutic treatments to Adamos daily from April 27 to April 29, 1932, and again daily from May 4 to May 11, 1932. These treatments lasted approximately one hour each.

In the death certificate signed and filed by Dr. Owens, made prima facie evidence by the Pennsylvania Act of 1915, P.L. 900, § 21, as amended by Act April 28, 1927, P. L. 498, § 1, 35 P.S.Pa. § 471, it is stated that Dr. Owens attended from March 15, 1932, to July 5, 1932.

None of these facts is disputed.

Dr. Wiley, the medical examiner who recorded the answer to the questions, testified that he asked Adamos the questions in Part II of the medical examination report; that he correctly recorded Adamos's answers thereto. Dr. Wiley further testified that he read the entire blank to Adamos, and all the questions; that he had no particular difficulty in making the man understand the questions, nor did he have any particular difficulty in understanding the answers, although Adamos spoke with a Greek accent.

The only evidence the plaintiff offered in rebuttal was to the effect that Adamos was an illiterate Greek, and that persons who did not understand Greek had to use an interpreter to converse with him.

The plaintiff conceives that this rebuttal testimony raised an issue of fact that should have gone to the jury as to whether or not the insured was such an illiterate, uneducated Greek, with so slight an understanding of English as to have been unable to make the false answers which appear on the original applications over his signature. We cannot so hold. As we view the law, Adamos bound himself and his beneficiary to the answers as signed. He had no business to sign his name to those answers unless he understood what he signed.

The courts generally hold that by signing an instrument, such as an application for insurance, the signer binds himself and those claiming through him to the instrument as signed. Stanulevich v. St. Lawrence Life Ass'n, 228 N.Y. 586, 127 N.E. 315; Kwiatkowski v. Brotherhood of American Yeomen, 243 N.Y. 394, 153 N.E. 847; Erickson v. Knights of Maccabees, 71 Colo. 9, 203 P. 674; Lauze v. New York Life Insurance Co., 74 N.H. 334, 68 A. 31; Emanuele v. Metropolitan Life Insurance Co., 137 Misc. 542, 242 N.Y.S. 715; New York Life Insurance Co. v. Fletcher, 117 U.S. 519, 6 S.Ct. 837, 29 L.Ed. 934; Ætna

Life Insurance Co. v. Moore, 231 U.S. 543, 34 S.Ct. 186, 58 L.Ed. 356; Raives v. Raives, 2 Cir., 54 F.2d 267; New York Life Insurance Co. v. Stewart, 5 Cir., 69 F.2d 957.

Mere illiteracy cannot be urged to avoid a written instrument. Commonwealth v. Gudaitis, 323 Pa. 110, 111; 186 A. 82.

The answers which are set out in the medical examination blank and signed by Adamos constituted a part of the policies sued upon. He could not hold the policies without becoming chargeable with knowledge of their contents. By accepting and retaining the policies, he must be held to have adopted as his own, the answers contained in the application attached to the policy, even though they may have been erroneously entered. New York Life Insurance Co. v. Stewart, 5 Cir., 69 F.2d 957.

That these answers were material to the risk, there can be no question. Nor can there be any question that they were false. Therefore, being false, they amount to a fraud upon the Insurance Company which has relied upon them in issuing the policies here in suit.

The answers in question were made to be relied upon and were relied upon by the Insurance Company under the undisputed evidence in this case.

Since the answers were false, it must follow as a matter of law that there was an intention to deceive. Claflin v. Commonwealth Insurance Co., 110 U.S. 81, 3 S.Ct. 507, 28 L.Ed. 76; Raives v. Raives, 2 Cir., 54 F.2d 267, 269.

We, therefore, conclude that the Insurance Company was entitled to have these policies held null and void, and that the plaintiff would then be entitled only to recover the premiums paid.

The plaintiff further contends that a special situation exists as to the second policy dated April 6, 1932, i. e., policy No. 11,773,181, on the ground that there was no application for this policy. There is no merit in this contention. As we have above noted, in the application, over Adamos's signature in the space marked "Additions and Amendments," is entered this notation: "Additional Policy $5000 written on the ordinary life plan." Then it also appears by the quotation from this application above noted, that Adamos ratified any additions or amendments by receiving and accepting this policy. The receipt and acceptance of this second policy with the application, medical history appended thereto, and the payment of the premium thereon, clearly indicated that this policy was issued on the basis of Adamos's medical history shown in the application attached to the policy. The case of Fidelity Title & Trust Company v. Metropolitan Life Insurance Company, 305 Pa. 296, 157 A. 614, cited by plaintiff in support of his position, is not in point, because there were no provisions for amendments and additions which appear in the instant case; and it was necessary to get an additional application signed by the assured, which was not done.

As to the last two policies issued, there is a further reason why the plaintiff could not recover, i. e., Adamos failed to inform the Insurance Company as to pertinent facts which occurred between the date of his medical examination and the delivery of the policies. These facts are, as above noted, that Adamos was in the West Penn Hospital from April 21 to April 29, 1932, and was examined there by three doctors who pronounced him to be suffering from an incurable cancer. One of these doctors, i. e., Dr. Langer, administered treatments for this cancer up to May 11, 1932. None of these facts was disclosed to the Insurance Company on the delivery of these policies. His failure to make this disclosure of itself would void these two policies. Stipcich v. Metropolitan Life Insurance Co., 277 U.S. 311, 48 S.Ct. 512, 72 L.Ed. 895.

In addition, by reason of the failure to make disclosure to the Insurance Company that Adamos had consulted and been treated by a physician between the date of his medical examination and the delivery of these policies, these policies would be void by the terms of the insurance contract itself, by reason of these facts. The law is well stated in Subar v. New York Life Insurance Company, 6 Cir., 60 F.2d 239, 240, as follows: "The provision in the application that the policy should not take effect upon delivery if the insured had consulted a physician since his medical examination became a part of the contract for insurance. First National Bank v. Hartford Fire Insurance Co., 95 U.S. 673, 675, 24 L.Ed. 563; New York Life Ins. Co. v. Wertheimer (D.C.) 272 F. 730; Columbian Nat. Life Ins. Co. v. Harrison, 12 F.2d 986 (C.C.A.6); Hurt v. New York Life Ins. Co. (C.C.A.) 51 F.(2d) 936, 937. And this is true though the insured did not read the application or know its contents, for, as

168

said in Lumber Underwriters v. Rife, 237 U.S. 605, 609, 610, 35 S.Ct. 717, 718, 59 L. Ed. 1140: 'No rational theory of contract can be made that does not hold the assured to know the contents of the instrument to which he seeks to hold the other party. * * * What he (assured) cannot do is to take a policy without reading it, and then when he comes to sue at law upon the instrument, ask to have it enforced otherwise than according to its terms.' "

We, therefore, conclude on the whole case that there was no issue of fact to go to the jury, and that the motion for a new trial must be denied. Let an order be submitted accordingly.